96 N.J. Super. 439 (1967)
233 A.2d 201
DONALD A. GOOD, WALLACE H. GOOD AND MARJEAN M. GOOD, PLAINTIFFS,
v.
LACKAWANNA LEATHER COMPANY, A NEW JERSEY CORPORATION, GOOD BROTHERS LEATHER COMPANY, A NEW JERSEY CORPORATION, CARL F. GOOD, ROSS L. DIMM, JR., GERARD K. LIND AND DALE McKNIGHT, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided July 27, 1967.
*442 Mr. Arthur L. Abrams and Mr. Charles J. Irwin for plaintiffs (Messrs. Abrams & Irwin, attorneys).
*443 Mr. William L. Dill, Jr. for defendants Lackawanna Leather Co., Ross L. Dimm, Jr. and Dale McKnight (Messrs. Stryker, Tams & Dill, attorneys).
Mr. David B. Schackner for defendants Good Bros. Leather Co., Carl F. Good and Gerard K. Lind (Messrs. Fox, Schackner, Neagle & Mastrangelo, attorneys).
MINTZ, J.S.C.
Plaintiffs Donald A. Good and Marjean M. Good are minority stockholders of defendants Good Bros. Leather Co. (hereinafter referred to as Good Bros.) and Lackawanna Leather Co. (hereinafter referred to as Lackawanna). They seek an appraisal of the value of their shares in accordance with N.J.S.A. 14:12-6 and 7 and N.J.S.A. 14:3-5. Alternatively, they seek an appraisal of their shares in both corporations in accordance with alleged common law rights. Plaintiffs specifically charge that (a) Good Bros. sold all or substantially all of its assets without the stockholder authorization required by N.J.S.A. 14:3-5; (b) Lackawanna and Good Bros. have been merged without the stockholder approval of either corporation required by N.J.S.A. 14:12-3, despite a rejection of the proposed merger by the majority of the stockholders of Good Bros., and (c) the common directors of Good Bros. and Lackawanna named as defendants in this proceeding conspired to sell Good Bros.' assets and merge the companies without complying with the statutory procedures, for the purpose of depriving plaintiffs of their statutory appraisal rights and should, accordingly, be held liable for punitive damages.
Defendant corporations have enjoyed a close relationship over the years. The predecessor to both corporations was a partnership between Herman B. Good and his brother Robert C. Good formed in 1896. This partnership engaged in various phases of the leather processing business. In 1903 the partners arranged for the incorporation of Lackawanna, which corporation chrome-tanned leather for the automobile trade. The plant was located in Hackettstown, N.J., where *444 it still exists. In 1914 Herman and Robert Good organized Good Bros. Inc., which established a plant in Newark. Herman B. Good was president and general manager. Robert's son, Donald S. Good, entered the employ of Lackawanna in about 1920, and upon the death of his father in 1944 became president of the company. Donald's son, Donald A. Good, is one of the plaintiffs in the within cause of action. Carl F. Good, one of the defendants, is the son of the late Herman B. Good.
Since 1957 Carl F. Good, Ross L. Dimm, Jr., Gerard K. Lind and Dale McKnight have been the majority shareholders and have controlled the boards of directors of both Good Bros. and Lackawanna. Carl F. Good is the president of Good Bros. and the chairman of the board of Lackawanna. Ross L. Dimm, Jr. is the president of Lackawanna and vice-president of Good Bros.
Almost since its inception Lackawanna has engaged in the business of finishing and selling fine leather for use by furniture and automobile manufacturers. It worked closely with Good Bros. purchasing much of its russet leather from it. Lackawanna was Good Bros.' principal customer for russettanned top grains. However, in 1956 Lackawanna acquired additional facilities in Hackettstown where it could accomplish the russet-tanning[1] of top grains cheaper than it would cost it to purchase the russet leather from Good Bros. Thus when in 1956 Lackawanna was able to russet-tan its own hides, Good Bros. went out of this phase of hide processing. The only tanning operations in which it thereafter engaged was on the splits, which it conducted for a period of approximately three years.
*445 In 1956 Donald S. Good, who was then president of Lackawanna offered to buy the majority interest in that company. The offer was rejected by the majority stockholders. He thereupon resigned, as did the executive vice-president and several other key employees. They immediately went to work for the Good-McCree Leather Company, a competitor, in Hackettstown, of which plaintiff Donald A. Good was president. In the fall of 1956, as a consequence of these resignations, Carl F. Good was elected president of Lackawanna, Ross L. Dimm, Jr. executive vice-president and Dale McKnight vice-president in charge of sales. Lackawanna was in poor condition. Its building, machinery and equipment had received little maintenance. The credit of the company was limited. Its customer relations were impaired and it had no inventory.
In the 1950s "lime splitting," a technological advance in the industry, was adopted in various tanneries. Theretofore, tanneries were unable to produce all the russet leather which they required. They looked to beam house processors, such as Good Bros., to supplement their needs for russet leather. With the advent of lime splitting they were able, with their current facilities, to produce all the russet leather needed. Thus, this new process seriously affected Good Bros. business. Lackawanna, however, did not become a fully integrated plant. Sewage problems at its Hackettstown plant would not permit the beam house operation. Hence, Good Bros. remained a source of supply of beamed hides.
In the light of this situation the boards of directors of Lackawanna and Good Bros. considered merger proposals. In December 1957 a memorandum proposing the merger of Good Bros. and Lackawanna was circulated among the directors, assigning the following reasons for the merger:
"The largest and most important leather finishing companies now have their own tanning departments which can supply all of their needs and, therefore, Good is dependent upon Lackawanna for the disposal of a major portion of its products. Obviously it would not be wise for Lackawanna to be dependent upon its competitors for its *446 supply of partially processed hides. Under present conditions, probably neither Good nor Lackawanna could successfully operate independently of the other. Obviously, it is important for both companies and for the stockholders of both companies that the company producing the finished product and offering it in the competitive market be in the strongest position possible to meet its competition."
The merger memorandum recommended that about one-third of the machinery and tools of Good Bros. be disposed of at salvage value, the Newark property of Good Bros. be sold, and the beaming operations of the merged companies be moved to a new location. The memorandum also called for the exchange and distribution of 1.85 shares of Lackawanna for each share of Good Bros. It further indicated that if dissents were filed, the proposed merger would not be effectuated because the appraisal rights attaching to the shares of the dissenters would cause a cash drain upon the affected companies which they could ill afford.
A formal merger agreement was approved by the boards of directors of both Good Bros. and Lackawanna. On April 26, 1958 said merger agreement was submitted to the stockholders of Lackawanna, at which time a resolution adopting the agreement of merger was passed by the two-thirds vote of the stockholders, as required by N.J.S.A. 14:12-3. However, the shares held or controlled by plaintiffs comprising approximately 20% of the outstanding shares, were voted against the merger, thereby entitling them to receive the appraisal value of their stock.
On May 24, 1958 Carl F. Good, as president of both corporations, advised the stockholders as follows:
"This is to advise you that the proposed merger of Good Bros. Leather Co. into The Lackawanna Leather Company dated as of March 31, 1958, will not be consummated. The holders of 1345 1/2 shares of stock of The Lackawanna Leather Company and the holders of 75 shares of stock of Good Bros. Leather Co. have given the respective corporations written notice of their dissent. Consequently if the merger were consummated the surviving corporation would be obliged to purchase the share of these dissenting stockholders at the appraised market value of such shares * * *.
*447 Accordingly, at the adjourned meeting of the stockholders of Good Bros. Leather * * * a vote on the merger will be taken, but the shares owned by members of the Board of Directors and their families will be voted to reject the proposed merger."
On June 7, 1958 the proposed merger was rejected by a majority of the stockholders of Good Bros. Plaintiffs allege, however, that defendants achieved the very objectives sought by the statutory merger plan notwithstanding the rejection, and thus actually accomplished a de facto merger as of about December 31, 1960. Plaintiffs also contend that by the end of 1961 Good Bros. sold substantially all of its assets without the stockholder authorization required by N.J.S.A. 14:3-5. It is asserted that the subsequent course of conduct on the part of the respective corporations confirms and establishes the de facto merger and alleged unauthorized sale of all the assets of Good Bros.
Plaintiffs point to the marked change and curtailment in the nature of Good Bros. operations after 1959. Good Bros. faltering business is evidenced by the fact that at the end of 1959 it had but one remaining customer, namely, Lackawanna for whom it beamed hides. The sales pattern also manifests a business decline. In 1958 its gross sales amounted to $1,291,524. Although in 1959 its gross sales increased to $2,192,395, this substantial increase was in some measure attributable to the sale in December of its entire hide inventory to Lackawanna, and a temporary increase in demand and price for its beamed products. However, in 1960 sales totalled only $260,544. In 1961 sales totalled $267,360, and in 1964 $306,893.
On December 1, 1960 Good Bros. sold its land, buildings and improvements in Newark to the Remis Trust Fund. At the same time it entered into a contract with H. Remis & Co. to perform such beaming operations as Good Bros. should require for a period of five years. Good Bros. tried to sell its beaming equipment to Remis but Remis would not purchase it. For the following five years Good Bros. was able to do the beaming required by Lackawanna and to make *448 a profit by charging Lackawanna a competitive price which was in excess of the price under its subcontract with Remis. In addition to the beaming for Good Bros., Remis did some beaming for its own account for which it paid Good Bros. for the use of the latter's machinery.
In 1961 all personnel at the Newark plant were transferred to the Remis payroll except for a supervisor and Carl F. Good. Remis performed the beaming of hides owned by Lackawanna under its subcontract with Good Bros. This arrangement continued until August 1, 1966. As a consequence of the change in the Good Bros. operation after 1959, there was little need for the fixed assets, which accordingly were sold, scrapped or abandoned. There was a gradual disposal of the operating assets, such as inventories which were sold to Lackawanna, and accounts receivable which were converted into cash or its equivalent.
In the 1960s the net worth of Good Bros. averaged about $400,000. By 1964, when 94% of its assets were reduced to cash or its equivalent, the only equipment included in the net worth figure was the beaming machinery being used by Remis, having a book value of $25,900.
As early as June 1, 1960, and perhaps prior thereto, the officers and directors of Good Bros. made known to its stockholders its plan, if possible, to sell its Newark property and relocate its beaming and pickling operations in another area. The testimony indicates that substantial freight as well as other charges could be eliminated by the relocation of the beam house in close proximity to the raw hide market.
During the period 1960-1966 the risk of purchasing hides in a highly volatile and fluctuating market was borne by Lackawanna. During this period, green hides when purchased by Good Bros., were billed to Lackawanna at cost. Good Bros. from time to time loaned funds to Lackawanna to finance the purchase of hides by Lackawanna which were beamed by Good Bros. under its subcontract with Remis. On such borrowings Good Bros. was paid interest at current bank rates. Resolutions were adopted from time to time by Lackawanna *449 and Good Bros. authorizing the loans. The first such resolution was adopted by the directors of Lackawanna on December 23, 1959. This resolution authorized the corporation to borrow approximately $100,000 from Good Bros. at current interest rates. The funds were to be used to purchase green hides and to pay for the processing of the hides by Good Bros. in Newark.
Good Bros. likewise on December 23, 1959 adopted a resolution authorizing said corporation to loan up to $100,000 to Lackawanna at current interest rates to enable Lackawanna to purchase the hide inventory required for its business. Subsequently, this loan authorization was increased to $200,000. On September 12, 1961 at a special meeting of the board of directors of Lackawanna, its officers were authorized to borrow an additional $50,000 in excess of the $200,000 then permitted from Good Bros. as a temporary measure until October 2, 1961. Apparently on that date Lackawanna was unable to repay the $50,000 to Good Bros. There is a journal entry under date of October 2, 1961 for the purchase of green hides by Good from Lackawanna in the amount of $49,715.66 and a charge to interest income on the Good Bros. books in the sum of $284.34. A credit in favor of Lackawanna was entered on the notes receivable account for $50,000, thereby reducing the loan account to $200,000. Good Bros. subsequently resold the green hides to Lackawanna for $50,123. In other words, as an accommodation to Lackawanna, Good Bros. temporarily carried the green hides on its books as an asset. It also appears that Good Bros. occasionally purchased hides for its own account which were later resold to Lackawanna at cost.
In 1965 the directors of Good Bros. and Lackawanna were apprised of an available location in Omaha, Nebraska, on which to erect a tannery. Apparently it was agreed between the corporations that Good Bros. purchase the site and erect a building thereon in which beaming operations would be conducted by a corporation to be formed, in which Good Bros. and Lackawanna would be the stockholders. Accordingly, *450 Good Bros. purchased the property and erected a building thereon. The two corporations organized Lackawanna of Omaha, a Delaware corporation, two-thirds of the stock being subscribed to by Lackawanna and one-third by Good Bros. The invested capital of Good Bros. in Lackawanna of Omaha was $10,000. Good Bros. erected a building on the property which it in turn leased to Lackawanna of Omaha. The land and building cost Good Bros. approximately $200,000. The lease with Lackawanna of Omaha was for a period of 20 years, with Good Bros. receiving as rent a 12% return upon its investment. The beam house equipment was apparently installed by Lackawanna of Omaha. In August 1966 Lackawanna of Omaha commenced beaming hides under contract for Lackawanna. At about this time Good Bros. disposed of its machinery then used for beaming in the Newark plant.
It is anticipated that the new beam house operations in Omaha will prove mutually beneficial to Good Bros. and Lackawanna. As already observed, Lackawanna cannot operate a beam house at its Hackettstown plant because of sewage problems. It now has an assured and advantageously located source of beamed hides in Omaha. Good Bros. has an advantageous real estate investment under lease to Lackawanna of Omaha. It will also participate, by virtue of its one-third interest in Lackawanna of Omaha, in the profits that are expected to be earned by it in the beaming operation. And as already observed, Good Bros. is relieved from the risk of dealing in the volatile green hides market.

I
It is plaintiffs' theory that the close working relationship existing between Good Bros. and Lackawanna is tantamount to a merger of the two companies. Plaintiffs assert that Good Bros. assets are fully at the disposal of Lackawanna and that Good Bros. is, in effect, a private bank to be utilized in accordance with the whims of the directors of Lackawanna. *451 It is argued that although Good Bros. was not liquidated, it had no active business or tanning function to perform after December 31, 1960, and that by December 31, 1964, 94% of its plant and equipment was converted into money or investment securities.
Plaintiffs allege that the gross sales appearing on Good Bros.' records for the year 1961 and thereafter are really not gross sales at all. For example, the gross sales for 1964 reflect sales in hide processing and sales of green hides. Actually, the only hide processing Good Bros. performed was for Lackawanna through its arrangement with Remis. The sales of green hides were billed to Lackawanna at cost. It is thus contended that all the objectives of the proposed merger stated in the merger resolutions were in fact accomplished.
Initially, it may be noted that this is not a stockholder's derivative action. There is no charge of mismanagement or fraud to the detriment of either corporation. There is no charge that Good Bros. has been unfairly treated. True, the net worth of Good Bros. has not increased since 1959. However, this was in good measure due to loss of business because of changes in the industry and the obsolescence of its operation. The fact remains that since 1959 dividends have been paid annually to the stockholders of Good Bros.
A merger is defined in the leading New Jersey case dealing with the doctrine of de facto merger as the absorption by one corporation of one or more usually smaller corporations, which latter corporations lose their identity by becoming part of the larger enterprise. Applestein v. United Board & Carton Corp., 60 N.J. Super. 333, 342 (Ch. Div. 1960), affirmed 33 N.J. 22 (1960). The court in Applestein made the following findings, which it held spelled out a de facto merger of the two companies:
"Thus, every factor present in a corporate merger is found in this corporate plan, except, perhaps, a formal designation of the transaction as a `merger.' There is proposed: (1) a transfer of all the shares and all the assets of Interstate to United; (2) an assumption by United of Interstate's liabilities; (3) a `pooling of interests' of *452 the two corporations; (4) the absorption of Interstate by United, and the dissolution of Interstate; (5) a joinder of officers and directors from both corporations on an enlarged board of directors; (6) the present executive and operating personnel of Interstate will be retained in the employ of United; and (7) the shareholders of the absorbed corporation, Interstate, as represented by the sole stockholder, Epstein, will surrender his 1,250 shares in Interstate for 160,000 newly issued shares in United, the amalgamated enterprise."
Although every element found by the court in Applestein may not be essential in determining the existence of a de facto merger, there are certain key elements existing therein which are not present in the case at bar. Significantly, there has been no exchange or transfer of shares between Good Bros. and Lackawanna. A consolidation or merger always involves a transfer of the assets and business of one corporation to another in exchange for its securities. Ballantine on Corporations, § 280, p. 664. The leading cases discussing the applicability of the de facto merger doctrine all concern situations where there is a transfer of assets by one corporation in exchange for shares of the purchasing corporation. Applestein v. United Board & Carton Corp., supra; Marks v. Autocar Co., 153 F. Supp. 768 (D.C. Pa. 1959); Troupiansky v. Henry Disston & Sons, 151 F. Supp. 609 (D.C. Pa. 1957); Hariton v. Arco Electronics, Inc., 40 Del. Ch. 326, 182 A.2d 22 (Ch. Del. 1962), affirmed 188 A.2d 123 (Del. Sup. Ct. 1963); Farris v. Glen Alden Corp., 393 Pa. 427, 143 A.2d 25 (Sup. Ct. 1958). The issue common to all of the cited cases was whether the sale of assets in exchange for the shares of the purchasing corporation actually comprised a de facto merger of the corporations, thus making available dissenters' rights under the respective merger statutes. A concomitant of all of the cases was that the corporation disposing of its assets terminated all business functions and virtually went out of existence.
This is not the factual pattern presented in the case at bar. There has not been a transfer of assets by Good Bros. to Lackawanna in exchange for shares as called for in the rejected merger agreement. Good Bros. has not ceased its *453 corporate functions in furtherance of its charter. It earned interest on its loans to Lackawanna, and made an annual profit on the hide processing performed for Lackawanna through Remis. Good Bros. is very much alive and is enjoying profitable operations. It owns a building and land in Omaha from which it expects a 12% return on its investment. It also owns a one-third interest in Lackawanna of Omaha, Inc., a beaming operation, which corporation leases the aforementioned Omaha land and building. Good Bros. thus indirectly maintains its interest in the hopefully profitable phase of the hide processing industry. Lackawanna and Good Bros. always maintained and continue to maintain separate boards of directors and officers who hold regular meetings. Each corporation has its own accountant and files its separate tax returns. Each maintains its own bank accounts and investments.
Also lacking in the instant case, and of key importance, is the fact that Good Bros. has not assumed any of the liabilities of Lackawanna. True, Good Bros. has loaned working capital to Lackawanna, but in no instance has Good Bros. guaranteed the debts of Lackawanna. It has no liability to the creditors of Lackawanna and has not directed that the borrowed funds be utilized in any particular manner. Furthermore, Lackawanna has repaid its entire obligation to Good Bros., and the loan account was closed as of September 30, 1966.
Thus, it may be seen that virtually all of the elements which comprised a de facto merger in Applestein and the other cited decisions are lacking. There does exist a close working relationship between the two companies and there is an interlocking of directors and officers. However, the presence of these factors do not per se constitute a merger. The definition of merger in Applestein has not been satisfied. There has been no absorption by one corporation of the other, with the absorbed corporation losing its identity. This finding is illustrated by the fact that if appraisal rights were to be granted, it would be impossible to decide which corporation, *454 Good Bros. or Lackawanna, would be responsible for paying the value of the shares. N.J.S.A. 14:12-7, incorporating N.J.S.A. 14:12-6, provides for court appointed appraisers to value the shares of the dissenters. N.J.S.A. 14:12-6 specifically provides that the "consolidated corporation shall pay to such stockholder the value of his stock * * *" (emphasis supplied). The existence of two functioning corporate entities, each owning respective assets and carrying on distinct business functions, makes the statute impossible to apply. There is no consolidated corporation that may be called upon to pay the dissenters the value of their shares.
Although many of the economic objectives sought to be accomplished under the proposed and rejected statutory merger in fact have been achieved, this without more does not constitute a de facto merger.

II
As already observed, plaintiffs additionally contend that Good Bros. had sold all or substantially all of its property and assets by 1961 without the stockholders' authorization. They dissent to such sale and assert appraisal rights for their stock in Good Bros. pursuant to N.J.S.A. 14:3-5. This statute provides that:
"Any corporation * * * may, by action taken at a meeting of its board of directors, sell or exchange all or substantially all of its property and assets, including its good will, upon such terms and conditions and for such considerations, * * * as its board of directors deems expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of two-thirds in interest of the holders of each class of stock. * * *

* * * * * * * *
If any stockholder shall, at the meeting or within twenty days after the meeting or the receipt of notice of the consent, object to the sale, and demand payment for his shares, the objecting stockholder or the corporation may, within sixty days after the meeting or receipt of the notice of consent, apply for an appraisal of the stocks as provided in section 14:12-6 of this title, all of the provisions of which section shall in all respects be applicable." (Emphasis supplied)
*455 In finding that the disposal of assets by defendant Good Bros. was not of the nature contemplated by N.J.S.A. 14:3-5, it is initially noted that in 1961 and thereafter Good Bros. always retained substantial liquid investments. The operating assets were sold piecemeal over a period of years to several buyers. As already observed, until 1966 the machinery and equipment used for beaming operations was retained by Good Bros. and was being utilized by Remis under subcontract in the processing of hides primarily for Lackawanna. Thus, until 1966 Good Bros. was essentially conducting a beaming operation. Moreover, after Good Bros. sold the beaming equipment in 1966, its balance sheet at the end of that year showed assets having a value of $414,346.74. This figure includes the land and building in Omaha having a book value of $199,071.31. Clearly, therefore, upon termination of the Newark operation Good Bros. had not disposed of all or substantially all of its assets, but rather was left with a sizeable amount of current assets, including cash, notes receivable, investments and fixed assets.
The mere disposal of the physical plant and equipment in and of itself does not bring the transfer within N.J.S.A. 14:3-5. In order for a shareholder to exercise his dissenter's rights under the statute, there must be a sale or exchange of all or substantially all of the corporation's property and assets including its good will. While it may be argued that Good Bros. had little good will to sell, the fact remains that whatever good will there is incident to its business conducted over a period of some 50 years was not included in any sale of assets. And as already observed, Good Bros. did not dispose of all of its assets since it was left in 1966 with a considerable amount of cash, investments and fixed assets.
The remaining issue is whether Good Bros. sold substantially all of its assets and good will to bring it within the purview of N.J.S.A. 14:3-5. I find that it did not. In order to qualify as a sale of substantially all of the property and assets within the contemplation of the statute, the sale *456 must be one out of the ordinary course of business and tantamount to the winding up of a going business operation. This conclusion is evidenced by the language in the statute which allows appraisal rights when there is a sale of assets, including good will. By making the disposal of good will a prerequisite to appraisal rights, the Legislature apparently contemplated a situation whereby the selling corporation completely winds up its buisness affairs since a disposal of good will would, in effect, destroy the corporation. Thus, the test to be applied is not the amount or value of the assets disposed of, but rather the nature of the transaction, i.e., is the sale in furtherance of the express objects of the corporation's existence. See Annotation, "Applicability of statutes regulating sale of assets or property of corporation as affected by purpose or charter of corporation," 9 A.L.R.2d 1306 (1949); cf. In re Kunin, 281 App. Div. 635, 121 N.Y.S.2d 220 (App. Div. 1953), affirmed 306 N.Y. 967, 120 N.E. 228 (Ct. App. 1954); Eisen v. Post, 3 N.Y.2d 518, 146 N.E.2d 779 (Ct. App. 1957); Matter of Miglietta (2660 Broadway Corp.) 287 N.Y. 246, 39 N.E.2d 224 (Ct. App. 1942); Matter of Timmis, 200 N.Y. 177, 93 N.E. 522 (Ct. App. 1910).
The sale of the obsolete and unusable assets by Good Bros. was not in contemplation of the winding up of its business and thus not within N.J.S.A. 14:3-5. The equipment disposed of between 1960 and 1965 presumably was utilized in the russet-tanning phase of the business. Technological advances causing the decline of this phase of Good Bros. operations rendered this equipment useless, and the directors in the exercise of sound business discretion chose to dispose of it. The Newark real estate was sold in 1960 with a view to ultimately relocating the plant elsewhere. Significantly, the equipment used in the more profitable beaming operations was retained until 1966, when Good Bros. was able to relocate in Omaha with more modern facilities. In fact, the shareholders of Good Bros. were apprised by a letter from Carl F. Good dated June 1, 1960 of the *457 company's intent to sell its Newark property and relocate the business operations elsewhere. The subcontract under which Remis used Good Bros'. equipment to beam hides for Lackawanna was thus an interim and expedient arrangement until this goal could be accomplished.
Upon completion of the Omaha facilities Good Bros. continued its interests in beaming operations though concededly conducting its business in a somewhat different fashion. In lieu of directly purchasing and processing the hides, it owns a one-third interest in Lackawanna of Omaha, which corporation actually does the beaming. Furthermore, it alone owns the land and building in Omaha leased to Lackawanna of Omaha. Thus, Good Bros. continues to derive its income essentially from leather processing. It receives rental income from its ownership of the Omaha tannery and will receive a portion of the profits from the business operations of Lackawanna of Omaha. Good Bros'. altered mode of doing business is in furtherance of its corporate charter which permits it, inter alia, to purchase real property for use in the processing of hides and to acquire stock of other corporations. Significantly, there is no allegation that Good Bros. has engaged in any ultra vires activity.
A shareholder does not have a vested interest in the corporation's method of operations. A successful business operation contemplates a course of business which necessarily changes over a long period of time. A corporation cannot be expected to remain stagnant in the light of modern advancements in a given industry, and its method of doing business must be altered as business situations and opportunities require. Folk "De Facto Mergers in Delaware: Hariton v. Arco Electronics, Inc.," 49 Va. L. Rev. 1261 (1963). Appraisal rights under the sale of assets statute will not apply merely because a corporation alters its method of operation to keep pace with modern business trends.
The statute's applicability is predicated upon a fundamental change affecting the organic character of the corporation. The general reason for dissenters' rights is that shareholders *458 should not be forced against their will into something fundamentally different from that for which they impliedly bargained when they acquired their shares. Applestein v. United Board & Carton Corporation, supra; Farris v. Glen Alden Corp., 393 Pa. 427, 143 A.2d 25 (1958); see also Manning, "The Shareholder's Appraisal Remedy: An Essay for Frank Coker," 72 Yale L.J. 223, 249 (1962). There has been no change in the fundamental relationship between Good Bros. and its shareholders, for the sale of assets was not in exchange for the stock of the purchasers. And the change in the mode of operations of Good Bros. was not such a fundamental alteration of its corporate purpose as contemplated by its charter so as to call for the appraisal remedy.
Plaintiffs alternatively assert that if appraisal rights are not to be granted under N.J.S.A. 14:3-5, then the court may follow the common law and allow them payments for their shares. At common law unanimous shareholder consent was required in order for a corporation to sell all of its assets. Any attempt by the corporation to dispose of its assets without such unanimous consent was void and could be set aside upon the application of a dissenting shareholder. Kean v. Johnson, 9 N.J. Eq. 401 (Ch. 1853); 13 Fletcher, Cyclopedia of the Law of Private Corporations, § 5798 (1961). No appraisal rights were available. The common law was modified by N.J.S.A. 14:3-5 so that only a two-thirds majority of the holders of each class of stock having voting powers is required to sell all or substantially all of the corporation's assets. Those who vote against the sale or would have voted against it had the statutory procedure been followed, may not set it aside but rather are entitled to statutory appraisal rights.
The statute is an obvious modification of the common law and obviates its applicability. Since it has already been determined that there was no sale of assets in the case at bar such as to invoke appraisal rights under the aforementioned *459 statute, and since the statute abrogates the common law, it logically follows that no common law remedy is available.

III
Defendants assert laches as an affirmative defense to plaintiffs' claims of sale of assets and merger. N.J.S.A. 14:3-5 provides that a shareholder may object to a proposed sale of assets and demand appraisal rights for the shares within 60 days after the meeting approving the sale. N.J.S.A. 14:12-6 provides that a shareholder dissenting to a merger may, within 30 days after the adoption of the agreement, apply for appraisal rights.
Plaintiffs have asserted that the alleged merger was consummated by December 1960, and the sale of assets by the end of 1961. However, they did not bring suit until July 6, 1966. Due to the nature of this proceeding, plaintiffs are not strictly bound by the time provisions of N.J.S.A. 14:12-6 and 14:3-5 in bringing their action, but they are required to act with reasonable dispatch in view of all the circumstances. Unexcused delay may bar their right to relief, particularly where such delay results in prejudice to the defendants. 15 Fletcher, Cyclopedia of the Law of Private Corporations, § 7161 (1961). Laches is an affirmative equitable defense and applies where there is inexcusable delay in enforcing a known right whereby prejudice has resulted to the other party because of such delay. Clark v. Judge, 84 N.J. Super. 35 (Ch. Div. 1964), affirmed 44 N.J. 550 (1965).
That plaintiffs were apprised of the situation which they assert gave rise to the alleged merger and sale of assets is clear. As already observed, the stockholders of Lackawanna and Good Bros. received a letter dated June 1, 1960 advising them that Good Bros. proposed to sell its properties in Newark and relocate its beaming operations in another area. The letter fully disclosed the then existing relationship between Good Bros. and Lackawanna, and the status of the *460 Good Bros. operation. Moreover, plaintiff Wallace H. Good received a letter from Good Bros. signed by Carl F. Good dated February 3, 1961, advising him that the proposed sale had been consummated and of the long-term processing agreement with Remis. Plaintiffs, with knowledge of the facts in 1961, chose not to bring this cause of action until approximately five years later. That such an unexcused delay caused prejudice to both Good Bros. and Lackawanna is evidenced by the fact that Good Bros. in 1965 and 1966, prior to the institution of this suit, expended about $200,000 to purchase the land and build the plant in Omaha in furtherance of the plans indicated in Lackawanna's letter of June 1, 1960. Additionally, Lackawanna changed its position by purchasing a two-thirds interest in Lackawanna of Omaha. The defense of laches may be invoked as an additional basis for denying plaintiffs any relief.
Finally, since plaintiffs have not been deprived of any appraisal rights, their claim that the individual defendants conspired to deprive them of their alleged appraisal rights must necessarily fail.
Judgment for defendants. An appropriate form of judgment will be submitted, consented to as to form or to be settled on notice.
NOTES
[1] Russet-tanning is the first tanning operation taken to start the hides on their way toward a finished product. Beaming is the operation of soaking, defurring and defleshing green salted hides after they are received from the slaughter house. Splitting is the longitudinal splitting of the hides into component parts; the top section is the top grain and the lower section is referred to as the split. Splitting of the whole hide is part of the beam house operation.