Howard C. PRATT et al *v.*
BALLMAN-CUMMINGS FURNITURE COMPANY,
FORT SMITH CHAIR COMPANY and
John G. AYERS

76-269                                                        549 S.W. 2d 270

Opinion delivered April 4, 1977
(Division II)
[Rehearing, denied May 16, 1977.]

*Bradley D. Jesson,* of *Hardin, Jesson & Dawson,* and *H. Clay Robinson,* of *Pearce, Robinson & McCord,* for appellants.

*Edgar E. Bethell,* of *Bethell, Callaway & Robertson,* for appellees.

ELSIJANE T. ROY, Justice. We have before us the second chapter of this litigation. Appellants as minority stockholders of Ballman-Cummings sued that corporation and Fort Smith Chair Company, seeking to enjoin a proposed partnership between the two corporations or, alternatively, seeking appraisal and payment of the fair value of their stock pursuant to the provisions of Ark. Stat. Ann. § 64-707 (Repl. 1966).

After a hearing on the issue of appraisal only, the trial court held there was "insufficient evidence to establish a cause of action."

On appeal to this Court from the dismissal of the action, we remanded the proceeding in 254 Ark. 570, 495 S.W. 2d 509 (1973). In the opinion we stated the law recognizes "de facto mergers — an association under the guise of a partnership whereby one of the corporations loses its identity as such and is actually controlled by the management of the partnership." If this occurs the dissenting shareholders are entitled to an appraisement and cash payment for their shares. We held that whether there had been such a merger was to be determined by the trial court based upon a complete hearing, and since appellant-stockholders had made a prima facie showing of a de facto merger or consolidation it was error to sustain a challenge to the sufficiency of their evidence.

Over the objections of the minority stockholders Ballman-Cummings amended its charter to permit it to enter into partnership agreements, and Ayers Furniture Industries was established, consisting of two partners, Ballman-Cummings Furniture Company and Fort Smith Chair Company. Appellants formally notified Ballman-Cummings that they were demanding the "fair value" of their stock pursuant to the provisions of Ark. Stat. Ann. §§ 64-707 and 64-804 (Repl. 1966). When the company refused to make such payments appellants instituted action to enforce their rights as dissenting stockholders. The members of the Ayers family of Fort Smith, by virtue of their stockholdings, controlled both corporations and the corporations had interlocking directors. John Ayers is the chief officer of Ballman-Cummings, of Fort Smith Chair and the general manager of the partnership.

The partnership agreement provides, in Article II, § 5: "The partners shall designate one individual as a General Manager of the partnership who will be fully authorized to conduct the business and affairs of the partnership."

Article III of the agreement provides:

Section 1. The partnership shall purchase from each partner, f.o.b. the respective manufacturing plants, all furniture produced by either partner.

Section 2. The partnership shall pay for said furniture ninety (90) per cent of the listed sales price of the furniture, which amount shall be credited to the account of the partner on the books of the partnership at the time of delivery.

Section 3. Either partner may, at any time after delivery of furniture to the partnership, upon demand receive payment of the purchase price of furniture sold to the partnership.

Section 4. The partnership shall establish necessary warehouses in Fort Smith and elsewhere, as required, to store furniture purchased from the partners. Risk of loss is on the partnership after the furniture leaves the shipping dock of either partner.

Section 5. The partnership shall maintain a sales organization, prepare and distribute appropriate catalogs and other advertising material, and pay salesmen's commissions. The partnership shall be responsible for all merchandising functions in connection with the promotion and sale of furniture.

Section 6. The partnership will be responsible for the billing of its customers and the collections of its accounts with such customers. The partnership, as owner of such accounts receivable, may pledge or sell such accounts as it may deem necessary or desirable. Risk of loss on accounts receivable shall be on the partnership.

Section 7. The partnership shall be responsible for the distribution of furniture to its customers, and for the return of furniture when for any reason it is not accepted by the customer. In the event furniture is returned for reasons of defective manufacture, the partnership shall be entitled to return the same to the partner who produced it, and shall be entitled to credit on its account with such partner.

Section 8. Each partner agrees to provide for the use of the partnership and at its own expense, certain executive, administrative and clerical employees, as may be mutually agreed upon by the partners.

Prior to formation of the partnership, Ballman-Cummings had shown a net operating profit in all years except one since the early 1950's. However, beginning with establishment of the partnership in 1967, the operations of Ballman-Cummings showed a net loss each year thereafter, leaving the company with a total capital deficit of $767,590 by December 31, 1970. The record shows assets are now being liquidated.

The only witnesses who testified were John Ayers, general manager of both corporations and the partnership, and Eugene Rapley, now employed by Riverside Furniture and formerly vice president and sales manager of Ballman-Cummings.

Ayers' testimony reflected that all sales of furniture were made by employees of Ayers Furniture Industries; that purchasing for both operations was handled by the partnership with one comptroller. Before the partnership both companies had separate methods of invoicing and selling furniture. After the partnership was formed, all invoices were issued under the name of Ayers Furniture Industries. Ayers Furniture would also receive the payment for the invoices.[1] All advertising and marketing were done under the name of Ayers Furniture Industries. Sales lists, invoices, etc. for both companies were published under the name of Ayers Furniture Industries, with the individual corporate names also being shown.[2]

Ayers also testified that he and Tom Condren, former sales manager of Fort Smith Chair, and design and development manager of the partnership, and Gene Rapley were responsible for the decisions as to what prices were put on the price list issued by Ayers Furniture. When quizzed about

---

[1] Entries were made on the books to reflect credits due each corporation.

[2] The exhibits reflect the corporate names were rather inconspicuously printed thereon.

Ballman-Cummings' losses after the formation of the partnership, Ayers stated they were apparently caused by "loss cycles" and the loss of the "top production manager." No explanation was given as to why some corrective measures were not taken after the initial big loss.

The partnership was dissolved and Ballman-Cummings still exists as a corporation but has no operations for manufacturing furniture. It has a "negative net worth position of . . . around $700,000." The Board recommended liquidation to the stockholders of Ballman-Cummings. Fort Smith Chair is still in the manufacturing business and continues to market under the name of Ayers Furniture Industries and did make a profit in 1971, 1972 and 1973.

Rapley testified: The name Ballman-Cummings had good recognition with the dealers during his tenure there. Most of the dealers they sold to had dealt with Ballman-Cummings for a considerable period of time. Prior to the formation of the partnership the offices of Ballman-Cummings and the offices of Fort Smith Chair were at different locations, and the management of both companies was completely separate except for Ayers who performed common duties for both corporations. Thereafter the offices were at the same location and management functions were consolidated. Each company decided on its own designs, production schedules and credit policies. Each had its own comptroller and sales manager. After the formation of the partnership Rapley was sales manager of both Ballman-Cummings and Fort Smith Chair, as well as for the partnership; all sales were conducted through the partnership, there being no separate sales department in either Fort Smith Chair or Ballman-Cummings. Condren, formerly vice president and sales manager for Fort Smith Chair, became vice president and merchandise manager for the partnership. No furniture was manufactured without the approval of Ayers, Condren and Rapley, who decided jointly what type of merchandise would be manufactured and in what quantity. After formation of the partnership one person was in charge of making decisions concerning transportation and shipping for both companies.

Appellees argue forcefully that there has been no merger or consolidation — either de facto or de jure. Many factors

which have remained the same in both Fort Smith Chair and Ballman-Cummings since the organization of the partnership have been called to our attention by appellees. One of the factors upon which appellees place special emphasis is that board meetings continued to be held by Ballman-Cummings and Fort Smith Chair. However, a review of the minutes reflects that almost no matters of any substance were taken up at the board meetings. All decisions of major importance were made by the partnership.

Appellees in support of their position rely heavily upon the case of *Good* v. *Lackawanna Leather Company,* 96 N.J. Super. 439, 233 A. 2d 201 (1967), and cases cited therein, including *Applestein* v. *United Board & Carton Corp.,* 60 N. J. Super. 333, 159 A. 2d 146 (1960). Both cases set up key elements which should be considered by the courts in determining whether a merger has taken place. Appellees contend none of the factors indicating a merger are present in the case at bar. However, these are not the only factors to be considered, and this Court is required to look to substance not form in determining whether a de facto merger has occurred. The record indicates almost all the viable functions of Ballman-Cummings were taken over by the partnership.

In *Rath* v. *Rath Packing Company,* 257 Iowa 1277, 136 N.W. 2d 410 (1965), the court stated:

> If, as we hold, this agreement provides for what amounts to a merger of Rath and Needham, calling it a Plan and Agreement of Reorganization does not change its essential character. A fundamental maxim of equity, frequently applied, is that equity regards substance rather than form. (Citing cases.)

> It is our duty to look behind the form to the substance of the challenged transaction. *Kurtz* v. *Humboldt Trust & Savings Bank,* 231 Iowa 1347, 4 N.W. 2d 363. See also *Gibson* v. *American Railway Express Co.,* 195 Iowa 1126, 1132, 193 N.W. 274; *Metropolitan Edison Co.* v. *Commissioner of Internal Revenue,* Third Cir., Pa., 98 F. 2d 807, 809; *Chicago, S.F. & C.R. Co.* v. *Ashling,* 160 Ill. 373, 43 N.E. 373, 375 ("There is no magic in words. Merely

calling the transaction a purchase and sale would not prevent it from being a consolidation."); 19 C.J.S. Corporation § 1604, page 1367.

* * * A shareholder who dissents to a merger may obtain the value of his stock if the right thereto is provided by statute, if procedure is established therefor and is followed by him. * * *

*Applestein, supra,* held that:

If, in truth and in substance the proposed plan in this case is a "merger," why should the interested parties not frankly and honestly recognize it as such and pursue the statutory procedure . . . ? It is a fundamental maxim of equity that "Equity looks to the substance rather than the form." For example, a deed absolute on its face, if in truth a mortgage, will be treated in equity as a mortgage. This court of conscience never pays homage to the mere form of an instrument or transaction, if to do so would frustrate the law or place justice in chains. *The courts of equity* in New Jersey, and elsewhere, *have* never hesitated to look behind the form of a particular corporate transaction and find that it constituted a corporate merger, if in fact and in substance it was a merger, regardless of its deceptive outward appearance. (Italics supplied.)

Without active participation in purchasing, pricing, customer sales,[3] invoicing, collecting and with no effective control over management personnel, and with all important decisions made by the partnership, the Ballman-Cummings corporate image and goodwill were dissipated. Certainly all these factors constitute a fundamental change in operations causing Ballman-Cummings to become nothing but a shell of a corporation without substance, and a de facto merger has indeed taken place.

We do not mean that any and all partnership arrangements by corporations would constitute a de facto

---

[3]Ballman-Cummings formerly sold to hundreds of customers, now only to the partnership.

merger or consolidation. There are many combinations which would not lead to such a conclusion, but each case must be determined upon its own particular facts. Nevertheless, where the partnership arrangement results, as here, in an almost complete cessation of the operating functions of the corporation, such a de facto merger entitles the dissenting shareholders to the right of appraisal of their stock.

Reversed and remanded with directions to proceed in a manner not inconsistent with this opinion.

We agree. HARRIS, C.J., and FOGLEMAN and HICKMAN, JJ.