60 N.J. Super. 333 (1960)
159 A.2d 146
BENJAMIN APPLESTEIN, PLAINTIFF,
v.
UNITED BOARD & CARTON CORPORATION, A NEW JERSEY CORPORATION, ET AL., DEFENDANTS.
MARTHA U. BEUERLEIN, T/A HENNESEY & CO., INDIVIDUALLY AND ON BEHALF OF A CLASS OF STOCKHOLDERS SIMILARLY SITUATED, PLAINTIFF,
v.
UNITED BOARD AND CARTON CORPORATION, A NEW JERSEY CORPORATION, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 15, 1960.
*336 Messrs. Levy, Levy and Albert (Mr. Leon Levy and Mr. Philip Albert appearing), attorneys for plaintiff Benjamin Applestein.
Messrs. Warren, Chasan & Leyner (Mr. Raymond Chasan and Mr. Seymour Margulies appearing), attorneys for plaintiff Martha U. Beuerlein, etc.
Messrs. Kasen, Schnitzer & Kasen (Mr. Morris Schnitzer appearing), attorneys for defendants Interstate Container Corporation and Saul L. Epstein.
Mr. Isadore Glauberman, attorney for defendant United Board & Carton Corporation.
Mr. Maurice C. Brigadier, attorney for defendants Francis X. Conway, et al.
KILKENNY, J.S.C.
The parties herein, by written stipulation, have submitted for determination, as upon motions and cross-motions for partial summary judgment, a single limited issue. That issue is whether the agreement of July 7, 1959 among United Board and Carton Corporation, hereinafter referred to as "United," Interstate Container *337 Corporation, hereinafter referred to as "Interstate," and Saul L. Epstein, hereinafter referred to as "Epstein," and the transaction set forth in the proxy solicitation statement, hereinafter called "proxy statement," dated September 22, 1959, amount to a merger, entitling dissenting stockholders of United to an appraisal of their stock, and is therefore invalid.
The issue is submitted on the pleadings, the several exhibits referred to in the stipulation, all relevant law of New York and New Jersey, and the briefs of the respective parties. All other issues in the case are expressly reserved.
The parties have agreed on the record that there are no genuine issues as to any material facts, which would preclude the grant of partial summary judgment under R.R. 4:58-3, as to the single, limited issue submitted. Therefore, we are not concerned with those cases in which summary judgment is denied, because genuine issues as to material facts would require a hearing to determine the facts. The court has adduced the following facts from the limited material submitted under the stipulation.
United is an active corporation of New Jersey, organized in 1912. Its business consists in the manufacture and sale of paperboard, folding boxes, corrugated containers and laminated board, in that relative order of importance. Its present authorized capital stock consists of 400,000 shares, of which 240,000 have already been issued and are held by a great number of stockholders, no one of whom holds in excess of 10% of the outstanding shares. There are 160,000 shares not yet issued. The United stock is publicly held, there being 1,086 shareholders of record as of September 22, 1959, and the stock is traded on the New York Stock Exchange. The book value of each share of stock, as indicated by the proxy statement, is approximately $31.97. The consolidated balance sheet of United and its wholly owned subsidiaries, as of May 31, 1958, shows total assets of $10,121,233, and total liabilities of $2,561,724, and a net total capital of $7,559,509. Its business is managed by the *338 usual staff of officers and a board of directors consisting of seven directors.
Interstate was incorporated under the laws of New York in 1939. It owns several operating subsidiaries located in various parts of the northeastern section of the United States. It is engaged primarily in the manufacture and sale of corrugated shipping containers, and also containers which have the dual use of carriers and point of purchase displays. The major portion of its business is corrugated containers. Its corrugated board, other than that consumed by its own container operations, is used by outside plants for the manufacture of corrugated containers and, in some instances, for display items. Interstate has issued and outstanding 1,250 shares, all of which are owned and controlled by a single stockholder, Epstein, who thereby owns and controls Interstate. The consolidated balance sheet of Interstate and its subsidiaries, as of October 31, 1958, shows that its total assets are $7,956,424, and its total liabilities are $6,318,371, leaving a net total capital of $1,638,053.
No contention has been made herein that the two corporations, United and Interstate, are not engaged in business "of the same or a similar nature," as required by R.S. 14:12-1 for a valid merger or consolidation. Hence, we need not examine in detail their chartered purposes to determine if a merger would be invalid because of noncompliance with that statutory requirement, as in the case of Imperial Trust Co. v. Magazine Repeating Razor Co., 138 N.J. Eq. 20 (Ch. 1946).
United entered into a written agreement with Interstate and Epstein on July 7, 1959. In its language, it is not designated or referred to as a merger agreement, eo nomine. In fact, the word "merger" nowhere appears in that agreement. On the contrary, the agreement recites that it is an "exchange of Interstate stock for United Stock." Epstein agrees to assign and deliver to United his 1,250 shares of the common stock of Interstate solely in exchange for 160,000 as yet unissued shares of voting common stock (par value *339 $10) of United. Thus, by this so-called "exchange of stock" United would wholly own Interstate and its subsidiaries, and Epstein would thereupon own a 40% stock interest in United. Dollar-wise, on the basis of the book values of the two corporations hereinabove set forth, a combination of the assets and liabilities of United and Interstate would result in a net total capital of approximately $9,200,000, as against which there would be outstanding 400,000 shares, thereby reducing the present book value of each United share from about $31.97 to about $23, a shrinkage of about 28%. Epstein would contribute, book value-wise, the net total capital of Interstate in the amount of $1,638,053, for which he would receive a 40% interest in $9,200,000, the net total combined capital of United and Interstate, or about $3,680,000. The court is not basing its present decision upon the additional charge made by dissenting stockholders of United that the proposed agreement is basically unfair and inequitable. That is one of the reserved issues. The court recognizes that book values and real values are not necessarily the same thing, and, therefore, apparent inequities appearing from a comparison of the book values might be explained and justified.
The agreement of July 7, 1959 does not contemplate the continued future operation of Interstate, as a subsidiary corporation of United. Rather, it provides that United will take over all the outstanding stock of Interstate, that all of Interstate's "assets and liabilities will be recorded on the books of the Company (United)," and that Interstate will be dissolved. At the time of closing, Epstein has agreed to deliver the resignations of the officers and directors of Interstate and of its subsidiary corporations, so that, in effect, Interstate would have no officers, directors, or stockholders, other than United's. The agreement further stipulates that the by-laws of United shall be amended to increase the number of directors from 7 to 11. It provides for the filling of the additional directorships, it pre-ordains who will be the officers and new directors of United in the combined *340 enterprise, and even governs the salaries to be paid. Epstein would become the president and a director of United and, admittedly, would be in "effective control" of United. As stated in the proxy statement, "The transaction will be accounted for as a `pooling of interests' of the two corporations."
The stipulation of the parties removed from the court's present consideration not only the issue of the basic equity or fairness of the agreement, but also the legal effect and validity of the pre-determination of directorships, officers, salaries, and other similar terms of the bargain between the parties. The fairness of a merger agreement generally presents a question of a factual nature, ordinarily reserved for final hearing. If the alleged injustice of the project were the sole objection, I would be hesitant to substitute preliminarily my judgment for that of a transcendent majority of the stockholders.
In notifying its stockholders of a meeting to be held on October 15, 1959, in its proxy statement United advised the stockholders that "the proposal to approve the issuance of the common stock of the company is being submitted to the vote of the stockholders solely because of the requirements of the New York Stock Exchange; and accordingly stockholders who vote against or who do not vote in favor of the proposal will not, in the opinion of Luttinger & Passannante, general counsel for the company, be entitled to any rights of appraisal of their stock." They were also advised that adoption of the proposal would require the affirmative vote of the holders of only a majority of the shares present at the meeting in person or by proxy, provided a majority of all shares outstanding and entitled to vote thereon was present at the meeting.
The attorneys for the respective parties herein have conceded in the record that the proposed corporate action would be invalid, if this court determines that it would constitute a merger of United and Interstate, entitling the dissenting stockholders of United to an appraisal of their stock. The *341 notice of the stockholders' meeting and the proxy statement did not indicate that the purpose of the meeting was to effect a merger, and failed to give notice to the shareholders of their right to dissent to the plan of merger, if it were one, and claim their appraisal rights under the statute, as inferentially required by R.S. 14:12-3. Obviously, the notice of the meeting and proxy statement stressed the contrary, by labelling the proposed corporate action "an exchange of Interstate stock for United stock" rather than a merger, by its emphasis upon the need for a majority vote only, instead of the required two-thirds vote for a merger under the statute, and by the express declaration that dissenting stockholders would not be entitled to any rights of appraisal of their stock.
The scheduled meeting of October 15, 1959 was restrained by my order on that date in the action brought by the plaintiff Beuerlein. That order was modified in the Beuerlein action on October 19, 1959, to lift the restraint on holding a meeting, but continuing the restraint as to any implementation of any resolutions adopted at any meeting subsequently held. We are not now concerned with the legal effect of a meeting held on October 23, 1959, which was held without any new written notice thereof to the stockholders. An oral announcement was made to those present on October 15, 1959, when this court's restraining order against holding any meeting was still in effect in the Beuerlein action, advising those stockholders that the scheduled meeting was postponed to October 23, 1959.
Despite the contrary representations by United to its stockholders in its proxy statement, United's present position is that the proposed corporate action in acquiring and absorbing Interstate is a merger. This is evidenced by its answer to the cross-claim of Interstate and Epstein against it for specific performance of the agreement of July 7, 1959. At the hearing of the motions United's attorney stated in the record that United now contended, in addition to its other asserted defenses, that the fulfillment of the agreement *342 would constitute a merger. In fairness to United's attorney herein, it should be noted that this coincided with an earlier letter opinion furnished privately by him to United's officers substantially to the same effect, which letter he made part of the record, in his affidavit, when a question of good faith was raised.
Needless to say, if United, a New Jersey corporation, had followed that early advice given by its present New Jersey counsel herein and had followed the statutory procedure for corporate mergers, this litigation would have been avoided. Instead, it chose the opposite opinion of New York counsel that the plan would not be a merger, and so indicated to its stockholders in the proxy statement. It now finds itself ready and willing to agree with the plaintiff stockholders that the plan would be a merger of United and Interstate, and relies thereon, inter alia, in resisting the cross-claim for specific performance.
Looking, then, only to the single, crucial issue presently involved in this opinion  Did the proposed corporate action by United constitute such a "merger" as would entitle dissenting stockholders of United to an appraisal of their shares of stock?  let us first state some general principles.
A merger of corporations is the absorption by one corporation of one or more usually smaller corporations, which lose their identity by becoming part of the large enterprise. While the statutory authorization for a merger or consolidation of corporations is set forth in the same section, R.S. 14:12-1, and the procedure to accomplish the result is the same in either instance, and dissenting stockholders have equivalent rights of appraisal of their shares in a merger or a consolidation, an academic distinction still exists between them. A merger of two corporations contemplates that one will be absorbed by the other and go out of existence, but the absorbing corporation will remain. In a consolidation, the two corporations unite and both go out of existence, and a new amalgamated corporate enterprise takes the place of the former corporations.
*343 A study of the privilege of merging corporations discloses that such endeavors not only originally required the unanimous consent of the stockholders, but also were disfavored by many who apprehended the evils of a monopolistic tendency that might arise from amalgamations of corporations. Eventually, statutory authority to merge domestic corporations was attained. Ultimately, legislatures indulged the merger of domestic corporations and those organized in another state. R.S. 14:12-1. As a consequence of the legislative power to legalize mergers, the Legislature can prescribe the terms and conditions for a valid merger. Thus, our Legislature has resolved to confine the authority to merge to those corporations which are organized "for the purpose of carrying on any kind of business of the same or a similar nature." There are additional restrictions, such as the necessity of obtaining stockholder approval by a two-thirds vote of the stockholders, and the giving to dissenting stockholders of the right to have their shares appraised, if they are unwilling to continue in the amalgamated corporate enterprise. R.S. 14:12-1 et seq. Imperial Trust Co. v. Magazine Repeating Razor Co., supra.
The legal contention of Epstein and Interstate, and the four intervening United stockholders  Conway, Terry, McKenney, and Corsuti  is that the transaction constitutes a valid purchase by United of Epstein's shares in Interstate, and thereby the property of Interstate, pursuant to R.S. 14:3-9, to be followed by a merger of United, as the parent corporation, with its wholly-owned corporation, Interstate, pursuant to N.J.S.A. 14:12-10. Thus, it is claimed that United's dissenting stockholders have no appraisal rights under these two sections of the statutes, and especially since N.J.S.A. 14:12-10 expressly provides that N.J.S.A. 14:12-6 and R.S. 14:12-7, which grant appraisal rights in the usual merger, under R.S. 14:12-1, shall not apply to a merger under N.J.S.A. 14:12-10.
When a corporation sells or exchanges all, or substantially all of its property and assets, including its good will, as *344 permitted by R.S. 14:3-5, the stockholders of the selling corporation must approve by a two-thirds vote, and objecting stockholders of the selling corporation are given appraisal rights, as provided in N.J.S.A. 14:12-6 in the case of a merger.
But when a corporation buys real or personal property, or the stock of another corporation, as permitted under R.S. 14:3-9, stockholder approval is not required, and objecting shareholders of the purchasing corporation are given no appraisal rights in such a case. Further, the buying corporation may pay for such property or stock acquired by it in cash or in the capital stock of the purchasing corporation.
It is true that our present corporation law, R.S. 14:3-5, sanctions a corporate sale of all or substantially all of the property and assets of the selling corporation, with stockholder approval and appraisal rights in favor of objecting shareholders of the selling corporation. Likewise, our statute, R.S. 14:3-9, allows a corporate purchase of the property and stock of another corporation to be paid for in cash or the stock of the purchasing corporation. There is no dispute as to the existence of these present statutory devices for the sale and acquisition of corporate property and shares of stock. Hence, if the purchase by United of Interstate and its shares represented a bona fide utilization of the corporate power conferred by R.S. 14:3-9, and if the intended dissolution of Interstate represented a bona fide merger of a parent corporation with a wholly-owned corporation under N.J.S.A. 14:12-10, without more, United's dissenting shareholders would then have no right to an appraisal of their shares.
But when an authorized device, such as that provided for in a sale or purchase of assets, or a dissolution, is used to bring about a virtual consolidation or merger, minority stockholders may object on the ground that a direct method has been authorized for such a purpose. If consolidation or merger is permitted through a pretended sale of *345 assets or dissolution, minority stockholders may be frozen out of their legal rights of appraisal. If the court is obliged to consider only the device employed, or the mere form of the transaction, a corporate merger in fact can be achieved without any compliance with the statutory requirements for a valid merger, and without any regard for the statutory rights of dissenting shareholders. It would be strange if the powers conferred by our Legislature upon corporations under R.S. 14:3-9 for a purchase of the property and shares of another corporation and, under N.J.S.A. 14:12-10, for the merger of a parent corporation with a wholly-owned corporation can effect a corporate merger de facto, with all the characteristics and consequences of a merger, without any of the legislative safeguards and rights afforded to a dissenting shareholder in a de jure merger under R.S. 14:12-1 et seq. If that were so, we obtain the anomalous result of one part of the corporation law rendering nugatory another part of the same law in accomplishing the same result.
That the proposed corporate action is more than an "exchange of Interstate stock for United stock," as it is labelled in the agreement of July 7, 1959, and more than a purchase by United of Epstein's Interstate stock and the corporate properties of Interstate, pursuant to R.S. 14:3-9, is demonstrated by the following facts.
1. The exchange of stock is made expressly contingent upon stockholder approval of Proposal No. 2 increasing the number of directors of United from 7 to 11. Proxy statement, pp. 2 and 9. It is also so stipulated in paragraph 10 of the agreement.
2. United admits that by the exchange of stock Epstein will acquire 40% of United's outstanding stock "and effective control." Proxy statement, p. 3.
3. Epstein's "effective control" of United is made obvious, by the fact that two directors of United's present board of seven "will resign as directors." Proxy statement, p. 9. The agreement of July 7, 1959 expressly provides in paragraph *346 9, "The resignations of George Luttinger and Thomas V. Wade [two of United's directors] will be presented at the closing." This would leave United with only five of its present directors on the new enlarged board of 11 directors, which Proposal No. 2 insures as a contingent part of the deal. Thus, Epstein and the five new directors, presumably his associates and friends from Interstate, are assured a majority vote of six and control of the new 11-man board. It is clear that he who controls a majority of the board of directors generally controls the management and destiny of the corporation.
4. It is also pre-ordained by the agreement, in paragraph 9, who the new 11 directors will be. Reference to their names and to their present and past connection and relationship with Epstein and Interstate (Proxy statement, p. 10) shows that Epstein will really have "effective control" of the board and United, as the latter freely concedes.
5. While the proposed issuance by United to Epstein of 160,000 shares of United's total authorized 400,000 shares seems to give Epstein only a 40% stock interest in United, which by itself is substantial enough to control United as against the 1,086 other stockholders, but still less than the combined 60% of those 1,086 present United shareholders, 8 of those 1,086 present United shareholders, who would become directors on the enlarged board, already own 49,200 shares of United. Therefore, Epstein's new 160,000 shares plus those 49,200 shares would add up to 209,200 shares of the total 400,000, or better than 50%. Even if we discount the shares now held by Stuhr (18,000), Marchini (8,200), Passannante (300), Peters (300), and Miller (1,000), a total of 27,800 shares, because they are presently five of United's seven directors, although Miller is also vice-president and general manager of Allcraft Container Division of Interstate, Epstein's working stockholder control of United under the proposed corporate action is abundantly clear. Combined with his real control of the board of directors, the conclusion is inescapable that control of the affairs of United *347 would pass out of the present board of directors and out of the present majority of United's stockholders to Epstein and those associated with him in Interstate.
6. The proxy statement, p. 3, expressly recites: "The transaction will be accounted for as a `pooling of interests' of the two corporations." Such a characterization is descriptive of a merger or consolidation of two corporations, rather than a mere exchange of stock or purchase of corporate assets.
7. It is intended that Interstate will be dissolved. Dissolution is always an element of merger or consolidation and it is not a necessary concomitant of a mere exchange of stock or purchase of corporate assets.
8. United expressly represents (proxy statement, p. 3) that Interstate's "assets and liabilities will be recorded on the books of the Company [United] as set forth in the pro forma balance sheet." Proxy statement, pp. F 24-25. This is indicative of the fact that United is assuming Interstate's liabilities, a necessary legal consequence of a merger or consolidation, as contrasted with the normal non-assumption of the debts of the selling corporation, in the absence of special agreement, upon a mere "sale-of-assets" transaction. While one might argue that the language, "its assets and liabilities will be recorded on the books of the Company," is equivocal and not a clearly expressed intention on United's part to assume Interstate's liabilities, the intent to assume liabilities is made crystal clear, at least as to Interstate's almost million dollar debt to Mr. Jno. F. McKenney, an intervening defendant stockholder of United, and a former president of Interstate, who favors United's purported acquisition of Interstate. Thus, in the proxy statement, p. 11, we note this plain admission of intent:
"Interstate is indebted to Mr. Jno. F. McKenney in the sum of $997,112, as at April 30, 1959, which obligation, by the terms of the agreement between the Company and Interstate will be assumed by the Company [United]."
*348 9. Also, as a further evidence of Interstate's control and intervention in United's management,
"It is contemplated that the present executive and operating personnel of Interstate will be retained in the employ of the Company [United]." Proxy statement, p. 9.
Thus, every factor present in a corporate merger is found in this corporate plan, except, perhaps, a formal designation of the transaction as a "merger." There is proposed: (1) a transfer of all the shares and all the assets of Interstate to United; (2) an assumption by United of Interstate's liabilities; (3) a "pooling of interests" of the two corporations; (4) the absorption of Interstate by United, and the dissolution of Interstate; (5) a joinder of officers and directors from both corporations on an enlarged board of directors; (6) the present executive and operating personnel of Interstate will be retained in the employ of United; and (7) the shareholders of the absorbed corporation, Interstate, as represented by the sole stockholder, Epstein, will surrender his 1,250 shares in Interstate for 160,000 newly issued shares in United, the amalgamated enterprise.
If, in truth and in substance the proposed plan in this case is a "merger," why should the interested parties not frankly and honestly recognize it as such and pursue the statutory procedure under R.S. 14:12-1 et seq. for validating the proposal? It is a fundamental maxim of equity that "Equity looks to the substance rather than the form." For example, a deed absolute on its face, if in truth a mortgage, will be treated in equity as a mortgage. This court of conscience never pays homage to the mere form of an instrument or transaction, if to do so would frustrate the law or place justice in chains. The courts of equity in New Jersey, and elsewhere, have never hesitated to look behind the form of a particular corporate transaction and find that it constituted a corporate merger, if in fact and *349 in substance it was a merger, regardless of its deceptive outward appearance.
Would the proposed plan be a merger of a parent corporation with a wholly-owned corporation, as allowed by N.J.S.A. 14:12-10, and, therefore, free from the appraisal rights of dissenting stockholders? While it is true that the agreement would make United the owner of all the shares of Interstate, so that, in that sense, Interstate would be a corporation wholly owned by United, the plan does not provide for the future operation of Interstate, as a subsidiary or wholly owned corporation of United. Upon the so-called "pooling of interests," it is expressly intended that Interstate will be dissolved. It will never be a subsidiary corporation at all. It will not carry on its corporate activities, once the agreement has been completed. It will have no officers or directors. As the court remarked in Rochester R. Co. v. City of Rochester, N.Y., 205 U.S. 236, 27 S.Ct. 469, 476, 51 L.Ed. 784 (1907):
"A corporation without shareholders, without officers to manage its business, without property with which to do business, and without the right lawfully to do business, is dissolved by the operation of the law which brings this condition into existence."
Therefore, the situation intended to be covered by N.J.S.A. 14:12-10 is not present in this case and that statutory provision does not apply.
The courts of this State and of other jurisdictions have never hesitated in the past in finding that a particular corporate combination was in fact and in legal effect a merger or a consolidation, even though the transaction might have been otherwise labelled by the parties. Williamson v. New Jersey Southern R. Co., 26 N.J. Eq. 398 (Ch. 1875); Riker & Son Co. v. United Drug Co., 79 N.J. Eq. 580 (E. & A. 1911); Marks v. Autocar Co., 153 F. Supp. 768 (D.C.E.D. Pa. 1954); Farris v. Glen Alden Corp., 393 Pa. 427, 143 A.2d 25 (Sup. Ct. 1958). This is not a new legal philosophy, but is grounded upon the common *350 sense observation that judges, as well as laymen, have the right, and often the duty, to call a spade a spade, and to follow the long established equitable maxim of looking to the substance rather than the form, whenever justice requires.
We adopt the following language from the Farris case, supra.
"When use of the corporate form of business organization first became widespread, it was relatively easy for courts to define a `merger' or a `sale of assets' and to label a particular transaction as one or the other. * * *. But prompted by the desire to avoid the impact of adverse, and to obtain the benefits of favorable, government regulations, particularly federal tax laws, new accounting and legal techniques were developed by lawyers and accountants which interwove the elements characteristic of each, thereby creating hybrid forms of corporate amalgamation. Thus, it is no longer helpful to consider an individual transaction in the abstract and solely by reference to the various elements therein determine whether it is a `merger' or a `sale.' Instead, to determine properly the nature of a corporate transaction, we must refer not only to all the provisions of the agreement, but also to the consequences of the transaction and to the purposes of the provisions of the corporation law said to be applicable. We shall apply this principle to the instant case." (143 A.2d, at page 28)
The problem in hand has been analyzed in 72 Harv. L. Rev., p. 1132 (1959), in the article entitled, "The Right of Shareholders Dissenting from Corporate Combinations to Demand Cash Payments for their Shares." The similarities and differences between a merger or consolidation, and a sale or purchase of corporate assets, when the assets are sold for securities of the purchasing corporation, which assumes liabilities of the selling corporation, are reviewed in Ballantine on Corporations (rev. ed.), c. XIX, p. 663 et seq., and also in Lattin on Corporations (1959), c. 11, p. 496 et seq. A study of these texts and of the cases cited above, and the many cases cited by the respective parties in their briefs, satisfies this court that it is proper to disregard the form of a sale or purchase of assets transaction, when its characteristics are virtually identical to those of a statutory merger or consolidation for the purpose of insuring dissenting *351 stockholders their appraisal rights. It is also clear from that study that each case must be judged on its own peculiar facts, without any slavish adherence to determinations made in other cases, where there are similarities and also degrees of difference. Where, as here, we have more than a simple purchase by United of the assets of Interstate, as noted above, the conclusion is fairly drawn that the transaction in question will cause United to alter its existing fundamental relationship with its present shareholders, and will result in shifting the working control of United to Epstein and his associates in Interstate. In substance, regardless of the form, the transaction in question would be a merger of United and Interstate, or what the court described in the Farris case, supra, as a "de facto merger."
Counsel for Interstate and Epstein has contended that this doctrine of de facto merger applies only to the dissenting stockholders of the corporation being acquired, and not to those of the acquiring corporation. He argues, therefore, that even if this court holds that the corporate combination in this case is a de facto merger, the dissenting stockholders of United have no right to an appraisal of their shares because United would be acquiring Interstate. If, as this court holds, the transaction amounts to a merger in fact and in substance, there is no logical or legal reason for distinguishing between dissenting stockholders of the acquired corporation and those of the acquiring corporation. That distinction may be pertinent in a simple sale of assets transaction to determine whether it comes under R.S. 14:3-5, as a sale, in which the dissenting stockholders of the selling corporation have appraisal rights; or comes under R.S. 14:3-9, as a purchase, in which the dissenting stockholders of the purchasing corporation are given no statutory appraisal rights.
Where there is a de jure merger, formally expressed and clearly intended, the statute makes no such distinction. Under N.J.S.A. 14:12-6 and 14:12-7, the dissenting stockholders "of any of the corporations, merged or consolidated," *352 are given appraisal rights as set forth therein. It matters not whether they are the stockholders of the absorbed or absorbing corporation. Whether a merger is de jure or de facto, the reason for protecting the dissenting stockholders will apply equally, whether they are stockholders of the acquired or acquiring corporation. The reason for statutory protection is that stockholders should not be forced against their will into something fundamentally different from that for which they bargained when they acquired their shares. If the argument of these defendants were sound, then by the simple device of labelling one of the corporations the acquiring corporation and the other the acquired corporation, the substantial rights of appraisal would be arbitrarily taken away.
Furthermore, in this case, if it were necessary to make the determination, it seems clear to this court that while United appears to be acquiring Interstate, the converse is more probably true in practical effect. We cannot blind ourselves to the realities of the situation in this case, as shown by the facts. Even United in its proxy statement concedes that Epstein and Interstate are taking over United, by their reference to the fact that Epstein and Interstate will be in "effective control" of United. While technically Interstate, as a corporate entity, is being dissolved, and the name Interstate will disappear from this corporate combination, the control and management passes out of United and its 1,086 present shareholders to Epstein and his associates in Interstate. In substance, therefore, United is being sold to Epstein and Interstate, and the present board of directors and management of United are abdicating to Epstein and his corporate alter ego, Interstate. There is no good reason why the proposal should not have been submitted to the stockholders of United for their approval as a merger. The dissenting stockholders then would have the statutory right to object to the plan and obtain an appraisal of their respective shares. The majority, no matter however overwhelming it may turn out to be, may not trample upon *353 the property and appraisal rights of the minority shareholders of United, no matter how few they may be in number.

CONCLUSION.
This court holds that the corporate combination of United and Interstate, contemplated by their executory contract of July 7, 1959 and explained in United's proxy solicitation statement of September 22, 1959, would be a practical or de facto merger, in substance and in legal effect, within the protective purview of N.J.S.A. 14:12-7. Accordingly, the shareholders of United are and were entitled to be notified and advised of their statutory rights of dissent and appraisal. The failure of the corporate officers of United to take these steps and to obtain stockholder approval of the agreement by the statutory two-thirds vote under R.S. 14:12-3 at a properly convened meeting of the stockholders would render the proposed corporate action invalid.
Therefore, there will be partial summary judgment on the single, limited issue submitted in accordance with this holding.
All other issues, as provided in the written stipulation, are expressly reserved.