818 A.2d 372 (2002)
358 N.J. Super. 400
George C. EVERETT, Plaintiff-Appellant,
v.
STATE FARM INDEMNITY COMPANY, improperly plead as State Farm Insurance Companies/State Farm Indemnity Company, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued November 8, 2001.
Decided December 31, 2002.
*373 Thomas F. McGuire, Sr., Cherry Hill, argued the cause for appellant.
Diana La Femina-Rosa, Chatham, argued the cause for respondent (Maloof, Lebowitz, Connahan & Oleske, attorneys; Ms. La Femina-Rosa, on the brief).
Before Judges CUFF, WINKELSTEIN and C.S. FISHER.
PER CURIAM.
Plaintiff was injured in an automobile accident on January 27, 1996. On April 27, 1998, he filed a complaint against State Farm, his insurance carrier, for Personal Injury Protection Benefits (PIP), seeking payment for hospital and medical expenses, lost wages and other expenses he incurred as a result of the accident. On March 31, 2000, the Law Division granted defendant's motion for summary judgment based on plaintiff's failure to timely file his complaint. We disagree with the Law Division's conclusion and reverse.

I
On January 27, 1996, plaintiff was in a car parked on Center Street in Merchantville, Camden County. The car was struck on the driver's side by a motor vehicle driven by Kathleen A. Murphy, allegedly causing plaintiff injuries. After the accident, plaintiff sought treatment from Philip Getson, D.O. On January 31, 1996, Getson wrote a prescription for a thermophore electric pad, commonly referred to as a heating pad, to relieve plaintiff's "acute post-traumatic cervical, thoracic & lumbar str. & spr." Accompanying the prescription was a bill from Garden State Medical Equipment Co., the medical provider, for $56.03 and a claim form seeking payment for the heating pad. No doctors' notes, records or medical reports were submitted to State Farm at that time.
Between January 31, 1996, and April 12, 1999, plaintiff allegedly incurred medical expenses totaling $32,316.84. The largest bill, $16,135, was from Getson for services rendered from January 31, 1996, through April 15, 1998. The record does not indicate when the bills were submitted to State Farm. The earliest date on any claim form is June 19, 1998.
On August 1, 1996, Mary Willhouse, a State Farm claim representative, wrote a letter to plaintiff, with a copy to his counsel, advising that State Farm would consider no additional expenses after August 10, 1996; that if there were any unpaid bills for treatment prior to that date, they should be forwarded to State Farm for consideration. The letter was apparently written after the physician hired by State Farm to perform an independent medical examination (IME) concluded that plaintiff required no additional treatment for injuries sustained in the accident. The IME report is not part of the record. In the *374 record, however, is a letter from Getson, dated April 20, 1998, contesting State Farm's decision to "cut off" plaintiff's benefits in August 1996.
On September 13, 1996, Willhouse sent plaintiff's counsel a letter stating that State Farm never received an itemized bill or office notes from plaintiff's treating physician. The letter also advised plaintiff that bills State Farm received from other health care providers were denied since "without the treating physician's notes, there is no documentation of the medical necessity of the treatment provided." Willhouse further explained that the $56.03 bill from Garden State, which was reduced to $46.64 by Garden State after application of the fee schedule, was applied to plaintiff's $250 deductible; a subsequent bill from Garden State of $667.17 was not paid because the IME physician did not consider it medically justified, and a bill for wrist splints was denied because plaintiff's carpal tunnel syndrome was not considered related to the accident.
Although State Farm denied responsibility for paying the medical bills, it pursued its subrogation rights against the tortfeasor. In January 1998 State Farm applied for arbitration seeking reimbursement for various expenses incurred by plaintiff. In its contentions, State Farm sought "100 percent reimbursement of all medical and expense payments pursuant to N.J.S.A. 39:6A-9.1," on the grounds that State Farm paid out "PIP benefits." The total expenses sought and awarded were $1,272.69. Under the column labeled "medicals," however, no dollar amount was listed. Although plaintiff alleges State Farm included the $56.03 claim for the heating pad in its subrogation application, a breakdown of the expenditures for which reimbursement was sought does not include that particular expense. According to Willhouse, the $1,272.69 award is apportioned as follows: 1) fee for prior injury investigation$784.15; 2) fee for independent medical examination$450; 3) addendum fee for independent medical examination$35; and 4) copying expenses$3.54. Thus even though State Farm claimed reimbursement for medical expense payments, the only medical expense for which State Farm sought and received reimbursement was for the IME.

II
On appeal plaintiff argues that in reducing the $56.03 bill for the heating pad to $46.64, as authorized by the fee schedule, and applying the balance to plaintiff's $250 deductible, State Farm's action constituted "the last payment of benefits," tolling, for two years from that date, the time period within which to file a complaint for PIP benefits. N.J.S.A. 39:6A-13.1a. Plaintiff directs our attention to State Farm's own records to support his position. A document kept by State Farm, known as a "PAYMENT RECORD," shows the following:

 PAYMENT RECORD
Data of SS $$ Date Deductible Provider Patient Payment Total Paid
Payment of bill approved incurred or copay of service payment amount to date
---------------------------------------------------------------------------------------------------------------
7/1/96 56.03 46.64 1/31/96 46.64 G.S.Med.Equip. 46.64 ------ ------
---------------------------------------------------------------------------------------------------------------

Plaintiff alleges the bookkeeping entry on July 1, 1996, giving him credit for the $46.64, which State Farm considered the "Date of Payment," is the controlling date *375 for purposes of tolling the statute of limitations. Accordingly, plaintiff argues that the complaint, which was filed on April 27, 1998, within two years of July 1, 1996, was timely filed. State Farm responds that the phrase "last payment of benefits" requires that a benefit actually be paid either to the claimant or the health care provider, and thus, merely making the adjustment to the fee schedule and applying the balance to the deductible or copay, is not sufficient.
In rendering his decision in defendant's favor on March 31, 2000, the Law Division judge found that the bookkeeping entry was not a payment of benefits. The judge concluded that the statute required the expenditure of funds by the insurance company. He said:
[T]he question is whether or not a notation of the bill falls within the deductible, a payment is required by the statute. I don't think it is. I'm going to rule that it's not. It is not a payment. It is not the expenditure of funds by the insurance company. It's simply a notation. It's a bookkeeping entry so that they know at what point they become obligated to make payments, and that point is when the bills reach thereach the threshold, whatever the threshold might be. So, the motion for summary judgment is going to be granted.

III
To decide whether plaintiff's complaint was timely filed, we need to interpret N.J.S.A. 39:6A-13.1a. The pertinent portion of the statute reads as follows:
Every action for the payment of benefits... shall be commenced not later than two years after the injured person or survivor suffers a loss or incurs an expense and either knows or in the exercise of reasonable diligence should know that the loss or expense was caused by the accident, or not later than four years after the accident whichever is earlier[;] provided, however, that if benefits have been paid before then an action for further benefits may be commenced not later than two years after the last payment of benefits.

[N.J.S.A. 39:6A-13.1a (emphasis added).]
We begin our analysis by examining the underlying purpose of the No-Fault Insurance Act (Act), N.J.S.A. 39:6A-1 to -35, which is to assure that an injured plaintiff is promptly compensated for medical treatment resulting from injuries sustained in an automobile accident. Aponte-Correa v. Allstate Ins. Co., 162 N.J. 318, 323, 744 A.2d 175 (2000) (citation omitted). When the Act was initially passed it did not contain a statute of limitations provision; the Legislature originally relied upon the general two-year statute of limitations period applicable to personal injury actions. See N.J.S.A. 2A:14-2; Danilla v. Leatherby Ins. Co., 168 N.J.Super. 515, 519, 403 A.2d 925 (App.Div.1979). The Act was later amended to include N.J.S.A. 39:6A-13.1.
In general terms, statutes of limitations, including those set forth in N.J.S.A. 39:6A-13.1, are based on goals of "achieving security and stability in human affairs and ensuring that cases are not tried on the basis of stale evidence." Zaccardi v. Becker, 88 N.J. 245, 256, 440 A.2d 1329 (1982) (citations omitted).
A statute of limitations has two purposes. The first is to stimulate litigants to pursue a right of action within a reasonable time so that the opposing party may have a fair opportunity to defend, thus preventing the litigation of stale claims. The second function is to penalize dilatoriness and serve as a measure of repose.

*376 [Ochs v. Fed. Ins. Co., 90 N.J. 108, 112, 447 A.2d 163 (1982) (citations and quotations omitted).]
In discussing the meaning of N.J.S.A. 39:6A-13.1, the Ochs Court noted:
Significantly, N.J.S.A. 39:6A-13.1 comes into play when the insured is pursuing an action for personal injury protection benefits in the face of non-payment of benefits claimed to be due from the insurer. It affects only whether or not an action may be maintained; once payment is determined to be due, the statute does not place any time limitations on the payment of future benefits.
....
[A] suit to recover PIP benefits seeks essentially a declaration of liability. It is not necessary to present an enumeration of the specific expenses. Once liability is established, the carrier is responsible for all medical expenses related to the accident.
[Id. at 114-15, 447 A.2d 163.]
In Washington v. Mkt. Transition Facility, 295 N.J.Super. 368, 369, 685 A.2d 57 (App.Div.1996), the issue addressed was "when does the statute begin to run where the insurer makes a voluntary partial payment of medical expenses." Concluding that the triggering event was the last payment actually made, Judge Pressler stated:
The statute places no qualification on the condition of `last payment of benefits.' A plain, literal and common-sense reading of the statute can only mean the last time any payment was made on account of the injuries sustained in the accident. We are also satisfied that a plain-meaning reading of the statute accords with legislative policy in enacting no-fault legislation, namely, the assurance of prompt and complete medical-expense payment to persons injured in automobile accidents.... In short, the no-fault legislation is remedial and, hence, entitled to liberal construction.

[Id. at 372, 685 A.2d 57 (citation omitted).]
We have also recognized that "the fact of payment has the capacity of taking the claim out of the basic two-year/four-year limitation of the statute altogether." Zupo v. CNA Ins. Co., 193 N.J.Super. 374, 380, 474 A.2d 259 (App.Div.), aff'd, 98 N.J. 30, 483 A.2d 811 (1984).
With these principles in mind, we address the meaning of "the last payment of benefits" in the context of N.J.S.A. 39:6A-13.1. State Farm argues the statute should be read literally. That is, "last payment of benefits" should be read to require actual payment by the insurance company to either the insured or a medical provider, and not a credit against the deductible or co-payment. State Farm's interpretation is reasonable. Since deductibles and co-payments guarantee that PIP medical expenses are not paid in every automobile accident, Roig v. Kelsey, 135 N.J. 500, 509, 641 A.2d 248 (1994), an argument can be made that a credit against the deductible, which is the responsibility of the insured, rather than the insurance company, is not payment of a benefit to the insured. However, keeping in mind that the object of the no-fault law is reparation, a more expansive definition of the phrase "payment of benefits" may also be inferred. Webster's Third New International Dictionary (1971) defines "payment" as "1: the act of paying or giving compensation: the discharge of a debt or an obligation." The word "pay" is defined as: "2a. to satisfy (someone) for services rendered or property delivered: discharge an obligation to: make due return to." Given this definition, plaintiff argues that when State Farm adjusted the *377 heating pad bill to the fee schedule and applied the balance to the plaintiff's deductible, the action was a discharge of the carrier's obligation to plaintiff; plaintiff received an indirect monetary benefit because his deductible was reduced. We agree.
It is axiomatic that if the text of a statute is susceptible to more than one interpretation, extrinsic factors, including statutory context and the underlying purpose of the legislation, must be considered. Aponte-Correa, supra, 162 N.J. at 323, 744 A.2d 175 (citations omitted).
As Justice Jacobs stated, `[w]hen all is said and done, the matter of statutory construction ... will not justly turn on literalisms, technisms, or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation.'
[Ibid. (quoting Jersey City Chapter of Prop. Owner's Protective Ass'n v. City Council, 55 N.J. 86, 100, 259 A.2d 698 (1969)).]
Construing N.J.S.A. 39:6A-13.1 in the context of the Act and according due consideration to the Act's underlying purposes, plaintiff's interpretation is compatible with the liberal construction of the Act. By applying the fee schedule to the bill for the heating pad, and crediting the balance against plaintiff's deductible, the insured received an indirect monetary benefit, a reduction in his deductible.
Yet that is not the only reason we conclude that application of the bill to the deductible constitutes a "payment of benefits" under the statute. A liberal construction of N.J.S.A. 39:6A-13.1 is harmonious with the underlying purposes of statutes of limitations.
There is no dispute that the charge for the heating pad was an expense plaintiff incurred as a result of the accident. The bill was timely submitted to State Farm, which adjusted the bill to the fee schedule and applied it to plaintiff's deductible. By taking this action State Farm implicitly acknowledged that the heating pad expense was an expense incurred by plaintiff directly attributable to the accident. Once State Farm related the expense to the accident, regardless of whether it made a payment to a health care provider, State Farm was on notice to expect that it may be faced with claims for additional medical expenses in the future. As Justice Clifford stated in Ochs, supra, "once payment is determined to be due, the statute does not place any time limitations on the payment of future benefits." 90 N.J. at 114, 447 A.2d 163. Stated somewhat differently, once State Farm made the decision to apply the adjusted heating pad bill to plaintiff's deductible, it was in the same position it would have been had it been necessary to make an expenditure of funds to a health care provider or plaintiff himself. It was aware of the accident, that plaintiff was receiving treatment as a result of injuries sustained in the accident, and there may be more bills to follow. Any expectation (or lack of expectation) of repose by State Farm was the same on July 1, 1996, as it would have been had money actually been paid to the provider or plaintiff. Because suit was filed within two years of July 1, 1996, when the expense was approved, the underlying purposes of the statute of limitations was fulfilled. State Farm had security and stability in its affairs, and would have been assured that the case was not tried on the basis of stale evidence.
Requiring the insurance company to actually make an expenditure of funds will result in a statute of limitations determined not only by the timely submission of an expense causally related to the accident, *378 but by the size of the deductible and the size of the bill. Here, plaintiff had a deductible of $250, the minimum required by statute. N.J.S.A. 39:6A-4. Had a bill for $400 been submitted rather than one for $56.03, State Farm no doubt would have applied the fee schedule and sent a check, either to plaintiff or the health care provider, for the balance due after the deductible was exhausted. In that case, there would be no dispute that the check constituted "the last payment of benefits." Here, however, because the first bill was for $56.03, no out-of-pocket payment was made. Accordingly, if we accept defendant's position, different tolling dates would apply depending upon the size of the health care provider's bill. The same result would similarly hold true depending upon the size of the deductible.
The arbitrariness of having the tolling date of the statute of limitations dependent upon the size of the deductible or the size of the bill can be demonstrated by the following example. If an insured with a $2,500 deductible, N.J.S.A. 39:6A-4.3, received intermittent treatment over a four-year period, and was billed by the health care provider at $400 per year, and in the fifth year submitted claims for services totaling $5,000 which were ultimately declined, a complaint challenging the insurance company's action would be barred since the deductible had not been depleted before receipt of the $5,000 claim. No action would have been filed either within two years after plaintiff incurred an expense or within four years of the accident. See N.J.S.A. 39:6A-13.1. Whereas, if the deductible was $250, the first $400 bill would have dissipated the entire deductible requiring an out-of-pocket payment to the health care provider by the insurance company, thereby tolling the statute of limitations for an additional two years with each $400 submission. Under either example the insurance company would have been in the same position vis-a-vis its knowledge of the accident and its ability to defend a lawsuit. Yet, under the former example plaintiff's complaint would have been barred. It is unlikely that the Legislature would have intended such an inconsistent result, permitting the statute of limitations to be tolled for those who can afford a higher premium by purchasing a lower deductible, and not for those insureds who receive a higher deductible in return for paying a lower premium. Such a scheme would not foster the purposes of the statute of limitations, repose for the defendant and the adjudication of fresh claims.
Our dissenting colleague suggests that we have disregarded the "inherently arbitrary nature of statutes of limitations," citing to Molnar v. Hedden, 138 N.J. 96, 102, 649 A.2d 71 (1994), and Rivera v. Prudential Prop. and Cas. Ins. Co., 104 N.J. 32, 40, 514 A.2d 1296 (1986). We agree that the Legislature may draw an arbitrary line that "fixes the time within which suit must be brought, [and] it does not invite variations depending on what the equities of a case may be." Molnar, supra, 138 N.J. at 102, 649 A.2d 71 (quoting Rivera, supra, 104 N.J. at 40, 514 A.2d 1296). Our disagreement with the dissent's line of reasoning is not with the necessarily arbitrary line which fixes a statute of limitations date, but rather with a construction which permits two claimants, whose claims both arose on the same side of the line, to be treated differently for purposes unrelated to the statute of limitations.

IV
In summary, therefore, since the heating pad bill was applied to the insured's deductible on July 1, 1996, and since the bill was an expense caused by the accident, we conclude that the process of adjusting the *379 bill to the fee schedule and applying the balance to the deductible constituted a "last payment of benefits" under the Act, making plaintiff's complaint, which was filed within two years of that date, timely. We therefore reverse and remand to the trial court for further proceedings consistent with this opinion.
Reversed and remanded.
FISHER, J.S.C. (t/a), dissenting.
An action for personal injury protection ("PIP") benefits, under these circumstances, must be deemed time-barred unless filed "not later than two years after the last payment of benefits." N.J.S.A. 39:6A-13.1a.[1] Here, the insurer never paid any money but did acknowledgewithin two years of the commencement of suit that a small expense incurred by the insured fell within, but did not exceed, the applicable deductible. Because I cannot agree this bookkeeping event constitutes a "payment" of benefits, I respectfully dissent.

I
The majority accurately describes the factual and procedural events and also fairly states the competing views of the parties. Plaintiff George C. Everett ("plaintiff") submitted a $56.03 bill to defendant State Farm Indemnity Company ("State Farm" or "insurer") for a heating pad allegedly required as a result of an auto accident. State Farm applied $46.64 of that bill against plaintiff's $250 deductible. It is conceded that State Farm paid nothing to plaintiff and paid nothing to the provider of the heating pad. Rather, State Farm made an entry in its records that (a) the bill was submitted, (b) $46.64 was "approved," (c) none of the $46.64 was paid, and (d) nothing had been "paid to date."[2] This eventwhich can only be viewed, as accurately described by the motion judge, as a "bookkeeping" eventis what the majority views as a "payment of benefits."
The statute of limitations contained in the No Fault Law[3] has raised one conundrum after another. These difficulties and the case-by-case struggles of our courts to wring clarity from this statute were recently canvassed in the majority and minority opinions in Aponte-Correa v. Allstate Ins. Co., 162 N.J. 318, 744 A.2d 175 (2000) and need not be repeated here. Notwithstanding the many prior encounters with this statute, the meaning of the word "payment" within the phrase "last payment of benefits" has not previously been considered or analyzed. Accordingly, we should look to the plain meaning of "payment," examine the manner in which *380 that word has been judicially construed in other contexts, and consider whether the policies and goals of the No Fault Law will be served by a broad or narrow construction.

II
Unlike the majority, I can find no ambiguity in the word "payment" in the present setting. I would conclude that "payment" simply means a transfer of money by the insurer to the insured or to someone on the insured's behalf. That plain meaning would render the bookkeeping adjustment made by State Farm against plaintiff's $250 deductible irrelevant. Without the actual expenditure of money, State Farm's ledger entry cannot be logically equated with a "payment" as that word is generally understood.
In ascertaining the meaning of a statute, courts adhere to the ordinary meaning of the words used unless that meaning can be shown to be at variance with the intention of the legislature or otherwise leads to a manifest absurdity. Schierstead v. Brigantine, 29 N.J. 220, 230, 148 A.2d 591 (1959); Essex Crane v. Director, Civ. Rights, 294 N.J.Super. 101, 106, 682 A.2d 750 (App.Div.1996). Thomas Jefferson once wrote that laws are made for persons "of ordinary understanding, and should therefore, be construed by the ordinary rules of common sense. Their meaning is not to be sought for in metaphysical subtleties, which may make anything mean everything or nothing at pleasure."[4] In a prior controversy about the meaning of the phrase "last payment of benefits"where the issue related more to the word "last" than "payment"we followed this philosophy by recognizing that N.J.S.A. 39:6A-13.1a should be given a "plain, literal and common-sense reading." Washington v. Market Transition Facility, 295 N.J.Super. 368, 372, 685 A.2d 57 (App.Div.1996).
Stretching the word "payment" to encompass a circumstance in which no money is paid by the insurer places its meaning in sharp contrast with ordinary discourse. The connotation adopted by the majority constitutes an inaccurate or, at best, highly unusual meaning which, in my view, no person "of ordinary understanding" would likely assume. Similarly, in McBoyle v. United States, 283 U.S. 25, 26, 51 S.Ct. 340, 75 L.Ed. 816 (1931), Justice Holmes, speaking for the Court, rejected a claim that the phrase "motor vehicle" in a statute included airplanes, finding "it is possible to use the word to signify a conveyance working on land, water or air, and sometimes legislation extends the use in that direction ...[,] [b]ut in everyday speech `vehicles' calls up a picture of a thing moving on land." Likewise, the word "payment," as used in N.J.S.A. 39:6A-13.1a, conjures up an image of money actually changing hands and not a mere adjustment in an insurance company's ledger.

III
Our courts, in other contexts, have given "payment" a meaning consistent with the view urged by State Farm. For example, it has long been the common law understanding that the mere presentation of a check or promissory note "is not payment if not itself paid." Spiotta v. William H. Wilson, Inc., 72 N.J.Super. 572, 580, 179 A.2d 49 (App.Div.), certif. denied, 37 N.J. 229, 181 A.2d 12 (1962); Freeholders of Middlesex v. Thomas, 20 N.J.Eq. 39 (Ch. 1869). "Payment" has been identically defined in a manner consistent with this common law definition when found in other statutes. In construing the workers' compensation laws, it has been held that *381 "`payment' means the act of paying, that is, to discharge indebtedness for; to make disposal of money; to make compensation for." Wager v. Burlington Elevators, Inc., 116 N.J.Super. 390, 397, 282 A.2d 437 (Law Div.1971), certif. denied, 65 N.J. 273, 321 A.2d 234 (1974). See also Jos L. Muscarelle, Inc. v. Central Iron Mfg. Co., 379 F.2d 715, 718 (3d Cir.1967) ("payment" as used within the New Jersey mechanic's lien statute does not mean the mere obtaining of a judgment without actual satisfaction).
"Where words in a statute have received a judicial construction, the Legislature will be deemed to have used them in the sense that had been thus ascribed to them." Commercial Trust Co. v. Hudson County Bd. of Taxation, 87 N.J.L. 179, 183-84, 92 A. 799 (E. & A.1915); River Dev. Corp. v. Liberty Corp., 51 N.J.Super. 447, 466, 144 A.2d 180 (App.Div.1958), aff'd, 29 N.J. 239, 148 A.2d 721 (1959); Ross v. Miller, 115 N.J.L. 61, 64, 178 A. 771 (Sup.Ct.1935). This judicial construction of "payment," known to the Legislature when it adopted N.J.S.A. 39:6a-13.1a, provides further evidence of the accuracy of State Farm's contentions.

IV
Yet, if we put aside the etymological debate over the potential meanings of the word "payment" in every day parlance, and if we also shun the way "payment" has been defined by our courts in other settings, there is nothing about the policies which underlie statutes of limitations in general and there is nothing about the history and goals of the No Fault Law in particular which justify the extraordinarily broad definition adopted by the majority.
The purpose of any statute of limitations, as a general matter, is "to stimulate litigants to pursue a right of action within a reasonable time so that the opposing party may have a fair opportunity to defend," and "to penalize dilatoriness and serve as a measure of repose." Aponte-Correa, supra, 162 N.J. at 324, 744 A.2d 175 (quoting Zupo v. CNA Ins. Co., 98 N.J. 30, 32, 483 A.2d 811 (1984)). In determining that an unusually broad definition of "payment" is warranted in light of these policies, the majority provides examples of the arbitrary impact caused by a more narrow definition. The problem with the majority's approach, I respectfully suggest, is its disregard for the inherently arbitrary nature of statutes of limitations. Molnar v. Hedden, 138 N.J. 96, 102, 649 A.2d 71 (1994); Rivera v. Prudential Prop. & Cas. Ins. Co., 104 N.J. 32, 40, 514 A.2d 1296 (1986). The plain meaning of N.J.S.A. 39:6A-13.1a should not be avoided merely because it might result in occasional arbitrary results; all statutes of limitations have a tendency to generate arbitrary results.
The examples of inconsistent results provided by the majority are no more unsettling than others which emanate from the routine enforcement of statutes of limitations. For instance, a personal injury suit filed two years and one day after its date of accrual will be routinely dismissed, whereas the same complaint filed two days earlier will be welcomed by our courts. In both circumstances, in the words of my colleagues, the defendant "would have been in the same position vis-a-vis its knowledge of the accident and its ability to defend a lawsuit." Yet a defendant's knowledge and ability to defend, the panacea offered by the majority for judging the applicability of the statute of limitations, is simply at odds with the bright lines drawn by our Legislature in enacting statutes of limitations. The majority's philosophy, if applied to all statutes of limitations, would soon eviscerate all statutes of limitations. The simple fact of the matter *382 is that statutes of limitations are, by their very nature, arbitrary.
I find nothing offensive in a statute of limitations which fixes the maintainability of a suit based on factors other than time and, thus, would not interpret N.J.S.A. 39:6A-13.1a in a duly broad and unnatural fashion so as to avoid the arbitrary or inequitable possibilities which trouble the majority. The No Fault Law has as its goal the reduction of insurance premiums through the elimination of minor tort claims from our congested court calendars. See, Section V, below. A potential bar of a claim due to its monetary insignificance is neither irrational nor inconsistent with that theme and well within the Legislature's authority to declare.
Whether a particular category of claims should be barred from the courts is for the Legislature to decide. Once the Legislature has drawn such parameters it is not our place to either question the wisdom of those boundaries or to seek to ameliorate harsh results merely to vindicate a personal view of what is just and equitable.

V
Even if we are to expect less rigidity in N.J.S.A. 39:6A-13.1a than other statutes of limitations, the overarching intent of the No Fault Law still compels a more limited understanding of the word "payment" than adopted by the majority. The Supreme Court has said the goal of the original 1972 No Fault Law was "`compensating a larger class of citizens than the traditional tort-based system and doing so with greater efficiency and at a lower cost.'" Oswin v. Shaw, 129 N.J. 290, 295, 609 A.2d 415 (1992) (quoting Emmer v. Merin, 233 N.J.Super. 568, 572, 559 A.2d 845 (App. Div.), certif. denied, 118 N.J. 181, 570 A.2d 950 (1989)). This was to be accomplished by the inclusion of PIP coverage in every New Jersey automobile liability insurance policy. As a result, medical-expense benefits are provided "without regard to negligence, liability or fault of any kind, to the named insured and members of his family residing in his household who sustained bodily injury as a result of an automobile accident." N.J.S.A. 39:6A-4. In exchange, the Legislation intended to cause a "limitation on or the elimination of conventional tort-based personal-injury lawsuits." Oswin, supra, 129 N.J. at 295, 609 A.2d 415.
The No Fault Law has been amended on numerous occasions to further stem the tide of escalating premiums and unnecessary litigation. The 1983 amendments required the presentation to insureds of a number of options of medical expense thresholds before personal injury suits could be commenced. As the Court said in Roig v. Kelsey, 135 N.J. 500, 505, 641 A.2d 248 (1994), "[o]nce again, motorists were presented with another trade-off option: lower premiums in exchange for increased tort thresholds." These legislative trade-offs, analyzed by the Court in Roig, continued to be adjusted throughout the 1980's and 1990's and demonstrate that the original intent of the No Fault Law remains at the forefront of all legislative efforts; this intent was "to reduce the cost of insurance, to eliminate minor tort claims from the judicial system, and to have medical expenses paid promptly." 135 N.J. at 506, 641 A.2d 248. The Court made particular note of the 1988 Veto Message wherein Governor Kean observed that "a viable `no fault' insurance system requires a significant limitation on lawsuits ... closing the courthouse door to all lawsuits except those involving bona fide serious injuries." Governor's Veto Message to Senate Bill No. 2637 (August 4, 1988) (quoted at 135 N.J. at 510, 641 A.2d 248).
The majority's decision places undue emphasis on the reparation goal of the No *383 Fault Law and has too little regard for the goal of reducing escalating insurance premiums through the elimination of minor tort claims from our congested courts. Indeed, the majority acknowledges, but then apparently discards, the significance of Roig and its analysis of N.J.S.A. 39:6A-12 which, in my view, mandate a narrow approach to the "payment of benefits" phrase in N.J.S.A. 39:6A-13.1a.
In Roig, Kelsey was a passenger in a motor vehicle driven by his sister when it was struck by Roig's motor vehicle. As a result, Kelsey incurred medical expenses of $1769. Kelsey was eligible for PIP benefits only under his sister's policy, which contained the basic $250 medical expense deductible and a 20% copayment for medical expenses between $250 and $5000; accordingly, $553.80 of Kelsey's expenses went unpaid. A declaratory judgment was filed which sought a determination of whether that part of Kelsey's expenses which remained uncompensated because of the deductible and copayment requirement was recoverable from Roig. The Court in Roig summarized the various changes to N.J.S.A. 39:6A-12 which resulted in a prohibition on the admission of evidence of "the amounts of any deductibles, copayments or exclusions" in a civil action for the recovery of damages for bodily injury. The Court concluded from the statute's incremental changes, as well as the No Fault Law's goal of reducing litigation, that the deductible mandated by the No Fault Law constitutes an amount to be borne by the insured:

by mandating the $250 deductible and the twenty-percent copayment, the Legislature guaranteed that in every automobile accident some medical expenses would not be paid under PIP. For those below-deductibles and copayments, the insured was responsible, either though [sic] the insured's other insurance coverage, or, if the insured had no other insurance, as in this case, out of the insured's own pocket.
[135 N.J. at 509, 641 A.2d 248 (emphasis added).]
Roig considered, and rejected, the idea that an injured party could seek recovery of expenses falling within a deductible against a tortfeasor.
Roig's message for the present case, and for cases in which the statute of limitations is implicated, is clear: an insured's incurring of medical expenses falling within a mandatory deductible does not constitute a relevant occurrence in determining the party's rights and obligations under the No Fault Law. To be consistent with the notion that all provisions within a statutory scheme ought to be construed so they will act in harmony, Matter of J.W.D., 149 N.J. 108, 115-16, 693 A.2d 92 (1997); Burt v. West Jersey Health Systems, 339 N.J.Super. 296, 304, 771 A.2d 683 (App. Div.2001), the meaning of the phrase "payment of benefits" contained in the No Fault Law's statute of limitations should be construed to require an actual payment by the insurer, not just a notation in its records that a particular bill falls within the insured's deductible.

VI
In the final analysis, an acknowledgement of an expense falling within an insured's deductible does not constitute a "payment" by the insurer nor a "benefit" to the insured. This construction, in my view, (1) is strongly suggested by the plain and ordinary meaning of "payment," (2) further justified by prior judicial construction of the word "payment," (3) should not be broadened because of possible arbitrary results which might otherwise attach, (4) is compelled by the well-settled goals of the No Fault Law to eliminate minor tort lawsuits and reduce escalating insurance premiums, *384 and (5) to be in accord with Roig v. Kelsey, is further mandated by the insignificant role deductibles should play in the application of the No Fault Law. Notwithstanding this persuasive evidence of the probable intent of N.J.S.A. 39:6A-13.1a, the majority has concluded that the incurring of an expense not covered by PIP is the equivalent of a "payment of benefits" for purposes of determining the timeliness of a claim for PIP benefits. Because I view that hypothesis as erroneous, I respectfully dissent. I would affirm the summary judgment entered by the motion judge.
NOTES
[1] It is recognized that N.J.S.A. 39:6A-13.1 creates other "windows" for the commencement of a timely action. It is indisputable that these other "windows" are not applicable to the present case.
[2] Plaintiff has latched onto the fact that this entry was made by State Farm on a document labelled "Payment Record" and the date of entry falls under a column labelled "date of payment." Plaintiff claims State Farm should be estopped from arguing its application of $46.64 to the deductible is not a "payment of benefits." I agree with the majority's determination not to adopt this approach. State Farm's inscriptions should not control the resolution of this issue. We should look to the substance of how State Farm handled this medical expense and not its inartful recording methods. See, e.g., Applestein v. United Board & Carton Corp., 60 N.J.Super. 333, 348, 159 A.2d 146 (Ch.Div.), aff'd o.b., 33 N.J. 72, 161 A.2d 474 (1960). Indeed, this argument fails to provide even the artificial support urged by plaintiff since the record also indicates the "payment amount" as "_______" and the "total paid to date" was "_______." There is no dispute that these strings of hyphens connote the undisputed fact that no money ever changed hands.
[3] N.J.S.A. 39:6A-1 to -35.
[4] Letter to William Johnson, June 12, 1823.